## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BRAND, et al., | ) | |
| | ) | No. 12 CV 1122 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| COMCAST CORPORATION & | ) | |
| COMCAST CABLE | ) | |
| COMMUNICATIONS MANAGEMENT, | ) | |
| LLC, | ) | |
| | ) | September 28, 2015 |
| Defendants. | ) | |

### MEMORANDUM OPINION and ORDER

Cable line technicians James Brand, Barry Farmer, Mark Graham, Kevin Jackson, Michael Jackson, Jose Vigil, and Christopher Woodard (collectively, "the plaintiffs") sued their employers, Comcast Corporation and Comcast Cable Communications Management, LLC (together, "Comcast"), under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105, *et seq.*, claiming that Comcast failed to pay them for compensable work time. Before the court are Comcast's motions for summary judgment with respect to each of the individual plaintiffs. For the following reasons, the motions are granted:

### Procedural History

Plaintiff James Brand originally brought this suit in February 2012 as a purported collective action under the FLSA and as a class action under the IMWL and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115, *et seq.*

In May 2012 the parties consented to the jurisdiction of this court for all further proceedings. (R. 27.) Shortly thereafter, Brand moved to conditionally certify a collective action under the FLSA. (R. 30.) In September 2012 this court granted that motion in part giving Brand permission to send notice of the collective action to "all individuals who were employed or are currently employed, by one or more of the defendants, its subsidiaries or affiliated companies, as line technicians or any similarly titled position at any time during the relevant statute of limitations period," but limiting notice to potential plaintiffs who have worked or work at Comcast's 112th Street facility in Chicago. (R. 56, Mem. Op. at 4, 7, 20.) Two months later, the court granted Comcast's motion to dismiss Brand's IWPCA claim. (R. 62.)

After several plaintiffs opted into the collective action and consented to this court's jurisdiction, (R. 118), the plaintiffs filed their third amended complaint, (R. 119). In this iteration of the complaint, the plaintiffs dropped their collective and class action allegations and instead brought their FLSA and IMWL claims as individuals.[1] The plaintiffs allege that Comcast violated federal and state wage laws by failing to pay them for their overtime work. (Id. ¶ 12.) Specifically, the plaintiffs claim that Comcast encouraged them to spend time before and after their shifts performing tasks such as reviewing assignments, checking routes, loading

---

[1] The names of Carlena Bolden and James Hughes appear as plaintiffs in the caption of the third amended complaint, but they have since been voluntarily dismissed from the suit. (R. 124; R. 131.) The third amended complaint also asserts an IWPCA claim, which the plaintiffs included only to preserve their right to appeal this court's decision dismissing the claim. (R. 115, Mot. to Amend at 2 n.1.)

and unloading their vehicles, completing their vehicle checklist, and performing work on portable computers, but it did not pay them for performing these tasks. (Id.)  Additionally, the plaintiffs allege that Comcast automatically deducted an hour from their schedule for daily meal breaks regardless of whether the plaintiffs worked through their breaks.  (Id.)  Finally, the plaintiffs assert that they are entitled to compensation for time they spent on call because they claimed that they were "highly restricted" during their on-call shifts.  (Id.)

After a period of discovery, Comcast filed seven separate motions for summary judgment, one per each plaintiff left in the suit.  (R. 136; R. 139; R. 142; R. 145; R. 148; R. 151; R. 154.)  These motions are now fully briefed and ready for disposition.  For the sake of efficiency, the court will address all seven motions in the current opinion.

## Facts

### A.   Facts Applicable to All Seven Plaintiffs

The following undisputed facts apply across the board to all seven of the plaintiffs' claims.  For ease of citation, the court will cite only to Brand's response to Comcast's Rule 56.1 statement of facts and Comcast's reply to Brand's additional facts with respect to the universally applicable facts.

#### 1.   Line Technicians' Job Duties

Comcast provides cable, entertainment, and communications products and services in the state of Illinois.  (R. 167, Pl.'s Resp. to Defs.' Facts ¶ 2.)  The plaintiffs are all current or former line technicians who work or have worked at

Comcast's 112th Street facility in Chicago. Comcast employs line technicians to maintain its cable network infrastructure. (Id. ¶ 6.) A line technician is responsible for maintaining node health, repairing outages, signal testing, and addressing other system issues for the network plant. (Id.) In particular, line technicians are charged with promptly identifying and restoring hard line plant issues. (Id. ¶ 7.) Comcast provides line technicians with a company work vehicle that they can use only for Comcast business and not for personal purposes. (R. 197, Defs.' Resp. to Pl.'s Add'l Facts ¶ 3.)

Comcast line technicians who work at the 112th Street facility are non-exempt employees who work three main shifts: 7:30 a.m. to 4:30 p.m.; 12:00 p.m. to 9:00 p.m.; and when they are on call, 3:00 p.m. to midnight. (R. 167, Pl.'s Resp. to Defs.' Facts ¶¶ 1, 8.) Line technicians could work either as "home garaging" technicians or "home dispatched" technicians. (Id. ¶¶ 10-11.) A home garaging line technician volunteers to park his Comcast vehicle at home rather than at Comcast's garage. (Id. ¶ 11.) A home garaging technician begins or ends each work day by driving between his home and a designated reporting location—such as a Comcast home office or meeting location—instead of driving directly to or from a customer's residence. (Id.) A home dispatched technician volunteers to drive his Comcast vehicle directly between his home and work assignments in the field. (Id. ¶¶ 10, 12.) Home dispatched technicians are paid for the time spent driving between their home and their first assignment, but are not paid for time driving from their last assignment to their home, unless they are performing work activities during the

4

drive. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 8.) According to Comcast's Vehicle Use Policy, employees who use Comcast vehicles must maintain them in accordance with defined maintenance procedures and must complete a monthly vehicle inspection report. (R. 167, Pl.'s Resp. to Defs.' Facts ¶ 14.) That responsibility currently includes a requirement that the line technician perform a daily safety check of the vehicle before driving it. (R. 197, Defs.' Resp. to Pl.'s Facts ¶¶ 5, 7.)

### 2. Comcast's Timekeeping Policies

Comcast maintains a number of written policies that require line technicians to report all time worked and that forbid working off the clock. For example, Comcast employees must acknowledge receipt of an employee handbook which states that:

> each employee agrees to record accurately all hours actually worked and further agrees not to misrepresent the hours worked either by overstating the actual hours or understating them. Employees must record, as time worked, any time performing services related to their duties or otherwise working on behalf of the Company, even if such time is prior to the scheduled shift start or stop time.

(R. 167, Pl.'s Resp. to Defs.' Facts ¶ 16.) Comcast's Time Reporting Guidelines for home garaging and home dispatched line technicians instruct them not to perform any work related tasks before logging into the system to start their shift or logging out of the system to end it. (Id. ¶ 19.) The guidelines also make clear that if a line technician does perform work related tasks before or after a shift, or if he or she works during a normally unpaid lunch period, he or she must "(i) notify his or her supervisor and (ii) properly record this work time on his/her time sheet." (Id.)

5

As for what activities constitute compensable work, Comcast policies state that work time includes any break lasting 20 minutes or less, noting that a "meal break is not considered time worked if the break lasts at least 30 minutes without interruption for work and you are relieved of all work duties." (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 12.) Comcast's "Getting Paid For Your Work: Time Recording Training for Hourly Employees" document ("Time Recording Training") states that "working off the clock is strictly prohibited." (R. 167, Pl.'s Resp. to Defs.' Facts ¶ 23.) It also instructs line technicians to include the following activities at the beginning of the work day as work time: "[l]ogging into the computer and other electronic devices provided by the Company; [o]pening work applications; [p]icking up work equipment; [and p]erforming safety checks." (Id. ¶ 25.) Similarly, it instructs line technicians to "record the exact time that you stop working at the end of your day," including as work time "any time spent at the end of the work day: [l]ogging out of the computer and other electronic devices; [c]losing work applications; [and u]nloading equipment." (Id. ¶ 27.) Time spent retrieving, reading, or listening to work related emails and voice mails or communicating with supervisors, Comcast employees, or customers is included in the definition of work time. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 9.) The Time Recording Training also states that employees should contact human resources if they feel they "are being forced to work off-the-clock," or alternatively, instructs them to contact a separate resource called "Comcast Listens" to report concerns about how they are paid. (R. 167, Pl.'s Resp. to Defs.' Facts ¶ 28.)

### 3. On-Call Policies

The plaintiffs have all worked on-call shifts that can last for up to seven days. (Id. ¶ 68.) These shifts are assigned on a rotating basis with each line technician working one week-long on-call shift approximately every six weeks. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 18.) When on call, line technicians' regular shifts change to 3:00 p.m. to midnight but they must also be available to respond to any outages in their service areas between the hours of midnight and 7:00 a.m. (R. 186-3, Brand Decl. ¶ 10.) During on-call shifts, line technicians can be called in to help with network restoration, escalation, and line call repair. (R. 167, Pl.'s Resp. to Defs.' Facts ¶ 67.) When line technicians are on call, they are required to be available by phone or Nextel. (Id. ¶ 69.) Although Comcast's Greater Chicago Region CommTech Administration Guide states that on-call employees "are free to engage in personal activities of their choice," it also makes clear that during on-call shifts line technicians "must be able to be contacted and be able to provide a quick and competent response if there is a service problem." (Id.) Specifically, Comcast's on-call policy states that called-in employees must report to work within 30 minutes after they speak with a company representative authorized to call them in and that failing to respond to a communication within a few minutes subjects them to "corrective action." (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 19.) Line technicians are paid $40 per day in standby pay while they are on call, but then they earn additional overtime pay when they are called in from the time they respond to the page until the time they return home. (R. 167, Pl.'s Resp. to Defs.' Facts ¶¶ 70-71.)

### 4. **Managers' Knowledge of Lunch-Break Work**

The plaintiffs have compiled evidence of a number of complaints that were made to the managers at the 112th Street facility regarding technicians working through lunch breaks starting in 2008. Comcast disputes many of the specifics regarding these complaints, but the following details are undisputed. In October 2008 a service technician (not a line technician) complained to his or her manager that jobs were being issued during the technicians' lunch breaks. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 20.) In May 2009, a technician at the 112th Street facility lodged a formal but anonymous complaint with the Illinois Department of Labor complaining that meal periods of 20 minutes or more were not being given to employees working 7.5 hours a day or longer. (Id. ¶ 21.) In July 2010, another anonymous complaint was lodged through the Comcast Listens Web Portal stating that technicians at the 112th Street facility would sometimes work through lunch when their workloads got heavy but that the supervisors would not pay them for working through lunch. (Id. ¶ 22.) In June 2012, an employee using the Comcast Listens Helpline lodged a complaint stating that Manager Mark Espinoza was "creating a hostile work environment by having unrealistic expectations." (Id. ¶ 24.) Specifically, the complaint stated that Espinoza pushed employees to the point of exhaustion, did not compensate them fairly for their work, and refused to compensate them for time spent after they logged in but before they started assisting customers. (Id.)

**B.      Facts Specific to Individual Plaintiffs**

The following facts address the relevant circumstances that are unique to each individual plaintiff.  It should be noted that there are instances in the parties' Local Rule 56.1 statements and responses in which both sides have attempted to dispute the other parties' facts by pointing to evidence that does not actually contradict the cited fact or by providing their own interpretation of what the fact means.  In such instances, or where a fact is otherwise improperly disputed, the court has deemed the fact admitted for purposes of the current motions.  *See* N.D. Ill. Local Rule 56.1.

**1.      James Brand**

During at least part of the period relevant to this lawsuit, Brand worked as a home dispatched technician, driving his Comcast vehicle directly from his home to field assignments and back.  (R. 167, Brand's Resp. to Defs.' Facts ¶ 10.)  Brand creates or receives his daily assignments using a Comcast database called "Watchtower."  (Id. ¶ 36.)  He typically logs into the database at 6:00 a.m. and he testified that the log-in process can last from 20 to 40 minutes.  (Id. ¶¶ 37-38.)  Brand also performs safety inspections on his Comcast vehicle before the start of his shift, a process that takes between 15 and 20 minutes.  (Id. ¶¶ 43-44.)  As for lunch breaks, Brand testified that he knows he is supposed to take up to a one-hour lunch break every day, but he was only able to take a lunch break "maybe three times a month, if [he] was lucky."  (Id. ¶¶ 48-51.)  After the end of his shift, Brand secures his Comcast vehicle and takes some equipment into his home for overnight storage,

9

a process that takes "maybe 20 minutes." (Id. ¶¶ 55, 57.) He also spends time logging off his computer at the end of the day, which could take 15 to 20 minutes, sending emails to report the status of his work for the day, and logging his miles. (Id. ¶¶ 56, 61, 63.)

Brand also worked week-long on-call shifts on a rotating basis. (Id. ¶ 68.) Brand was called out during 10 pay periods in 2009, 11 pay periods in 2010, and 8 pay periods in 2011. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 49.) Between 2009 and 2011, Brand was dispatched for 54.6% of the hours he was on call.[2] (Id. ¶ 49.) According to him, while he was on call he had to stay with his Comcast vehicle, could not have non-Comcast employees in his Comcast vehicle, was expected to respond to communications regarding an outage within five to ten minutes from receiving the communication, and had to stay in close enough range to his service area that he could complete a job in three hours. (Id. ¶ 51.) Brand testified that while on call he was able to run errands as long as he did not go so far that he could not respond to a page in a timely manner. (R. 167, Brand's Resp. to Defs.' Facts ¶ 72.)

Brand testified that supervisors Espinosa and Dave Johnson advised him not to record time that he worked before the start of his shift. (R. 216, Pl.'s Sur-Reply ¶ 30.) He said that Johnson told him only to record his scheduled hours on his

---

[2] The court is including in the individual facts, where available, Comcast's representation of the percentage of on-call hours each individual was called in to work during the relevant periods. Although those representations appear in Comcast's responses to the individual plaintiffs' additional facts, the court allowed the plaintiffs to file a joint sur-reply to those responses, and the plaintiffs did not dispute Comcast's representation of these facts. (R. 216, Sur-Reply at 27-28.)

timesheet. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 35.) Brand further testified that he was instructed to record a one-hour lunch break whether or not he took it. (R. 216, Pl.'s Sur-Reply ¶ 30.) Brand testified that he told his supervisors that he was unable to take lunch breaks because of his workload. (R. 197, Defs.' Resp. to Pl.'s Facts ¶ 41.) According to Brand, he also did not record time spent after 4:30 p.m. (the end of his shift) performing tasks such as safety checks and carrying equipment because he was instructed to record just the hours scheduled. (R. 216, Pl.'s Sur-Reply ¶ 30.) Brand did concede, however, that he did not believe there was ever a time when he recorded overtime hours but was not paid for it. (R. 167, Brand's Resp. to Defs.' Facts ¶ 33.)

### 2. Barry Farmer

During the period relevant to this lawsuit, Farmer has worked both as a home dispatched and a home garaging technician, working a regularly scheduled shift from 7:30 a.m. to 4:30 p.m. and a seven-day on-call shift every five weeks. (R. 170, Farmer's Resp. to Defs. Facts ¶¶ 9, 11.) When working as a home dispatched line technician, Farmer would log on to his computer as early as 6:00 a.m. (Id. ¶¶ 37-38.) It often took him 30 to 40 minutes to get logged into his computer and 10 to 15 minutes to check his assignments using Watchtower. (Id. ¶¶ 39-40.) Before leaving for a job or the garage, Farmer would inspect his truck for about 10 minutes, depending on the weather conditions and whether his inspection revealed any problems. (Id. ¶¶ 44-45.) When working as a home garaging technician, Farmer would often arrive at the 112th Street facility between 7:10 and

7:15 a.m. to download his meter, log into his computer, and to check his assignments before starting his shift. (R. 204, Defs.' Resp. to Farmer's Add'l Facts ¶¶ 31-33.) Some days Farmer did not take a lunch break because of his workload and only sometimes when he missed his lunch break would he record it as overtime. (R. 170, Farmer's Resp. to Defs. Facts ¶ 56.) He testified that he "couldn't begin to guess" how much unrecorded time he spent working through lunch. (Id. ¶ 61.) Even when Farmer took a lunch break, he sometimes spent time during the break looking at assignments, a task that can take between five and thirty minutes depending on the situation. (R. 204, Defs.' Resp. to Farmer's Facts ¶ 41.) Farmer testified that at the end of each day he spent five to ten minutes logging off his computer, five to ten minutes securing his equipment, and about ten minutes recording his time. (R. 170, Farmer's Resp. to Defs. Facts ¶¶ 68-70.) Farmer sometimes performed these tasks during his shift and sometimes he performed them after his shift ended at 4:30 p.m. (Id. ¶ 71.) If these tasks took longer than a half hour he would record that time as overtime and was paid for that time. (Id. ¶¶ 72, 75.) Farmer testified that Espinosa recommended that he not enter his start time for the day as the time he logged into his computer. (Id. ¶ 54.) He also testified that he told another supervisor, Steve Rembis, that he was checking assignments during his lunch break. (R. 216, Sur-Reply ¶ 43.)

Farmer testified that during on-call shifts he is able to watch television, run errands, make home repairs, and spend time with his kids. (R. 170, Farmer's Resp.

to Defs.' Facts ¶ 80.) Farmer reported being called out for 37.7% of the total hours he spent on call. (R. 204, Defs.' Resp. to Farmer's Facts ¶ 50.)

### 3. Mark Graham

Graham worked as a home dispatched line technician out of the 112th Street facility from 2003 through 2010, when his employment with Comcast ended. (R. 173, Graham's Resp. to Defs.' Facts ¶ 10; R. 199, Defs.' Resp. to Graham's Facts ¶ 31.) Graham worked a regular schedule of Sunday through Thursday, 7:30 a.m. to 4:30 p.m., throughout his employment with Comcast. (R. 173, Graham's Resp. to Defs.' Facts ¶ 9.) Graham chose to dispatch from home "to save a little gas so I don't have to drive my car to work and back." (Id. ¶ 13.) He testified that he was expected to be at his first job of the day by 8:00 a.m. (R. 199, Defs.' Resp. to Graham's Add'l Facts ¶ 32.)

Graham testified that he logged into his Comcast laptop between 6:30 a.m. and 7:00 a.m. each work day to pick up jobs for the start of his shift. (R. 173, Graham's Resp. to Defs.' Facts ¶ 32.) The process of logging in and choosing his jobs took him 15 to 20 minutes, but Graham did not record that time on his time sheets. (Id. ¶¶ 34-35.) Graham also spent 10 to 15 minutes before the start of his shift inspecting his truck. (Id. ¶ 36.) He did not record that time on his timesheets either. (Id. ¶ 37.) Although Graham was entitled to a one-hour lunch each day, whether he took lunch depended on his workload. (Id. ¶¶ 47, 50-51.) He estimates that he worked through lunch three days a week. (R. 199, Defs.' Resp. to Graham's Add'l Facts ¶ 37.) He testified that he did not record the time he worked through

lunch because he knew someone who had done so and was "beat up" for it. (Id. ¶¶ 40, 41.) After the end of his shift, Graham spent about 10 to 15 minutes securing his vehicle but did not record that time on his time sheets. (R. 173, Graham's Resp. to Defs.' Facts ¶¶ 53-55.) As for his on-call shifts, Graham understood Comcast's policy to be that he had five minutes to respond to a communication to avoid being disciplined. (R. 199, Defs.' Resp. to Graham's Add'l Facts ¶ 49.)

Graham testified that he believed that Espinosa was "cheating [him] on time." (R. 173, Graham's Resp. to Defs.' Facts ¶ 38.) He also testified that Espinosa did not give him any direct instructions on entering pre-shift time on his time sheets, but he received instructions from his supervisor Johnson. (Id. ¶ 41.) Graham testified that Johnson told him to record on his time sheet 7:30 a.m. to 4:30 p.m., unless he worked overtime, which he understood to mean "[a]ny time that's not your normal working time." (Id. ¶¶ 42-43.) Even though Graham had complained about other workplace issues, he never complained to his supervisor, manager, Comcast's Human Resources Department, or through Comcast Listens, about not being paid for all of the time he had worked. (Id. ¶ 31.)

### 4. Kevin Jackson

During his on-going tenure as a line technician with Comcast, Kevin Jackson has worked a 7:30 a.m. to 4:30 p.m. shift in both the home garaging and home dispatched roles. (R. 176, K. Jackson's Resp. to Defs.' Facts ¶¶ 1, 7, 10.) When he was home dispatched, Jackson "pretty much always" worked as a lead technician,

14

for which he received an additional $40 per day above his regular pay. (Id. ¶¶ 9, 33.) While he was home dispatched, Jackson would log into his computer between 6:00 a.m. and 6:30 a.m. each work day to check assignments and to assign jobs to other line technicians. (Id. ¶¶ 34-35.) The log-in process could take between 20 and 40 minutes. (R. 206, Defs.' Resp. to K. Jackson's Add'l Facts ¶ 36.) At the beginning of his work day, Jackson also conducted a "circle of safety" inspection on his Comcast vehicle and completed mileage forms. (R. 176, K. Jackson's Resp. to Defs.' Facts ¶ 41.) The amount of time the circle-of-safety inspection and inventory checks took him varied, but they could take between five and thirty minutes to complete. (R. 206, Defs.' Resp. to K. Jackson's Add'l Facts ¶ 34.) Jackson testified that he asked Espinosa if he could record the extra time he spent working pre-shift and Espinosa told him to record his start time as 7:30 a.m. (Id. ¶ 40.)

As for lunch-break and post-shift work, Jackson testified that whether he worked through part or all of his one-hour lunch break depended on the day and his workload. (R. 176, K. Jackson's Resp. to Defs.' Facts ¶ 46.) He estimates that before he went through the Employee Self Service[3] ("ESS") training in July 2013, his lunches were interrupted 70 to 75 percent of the time. (Id. ¶¶ 57-58.) As a lead technician, he took calls from other line technicians during his lunch. (R. 206, Defs.' Resp. to K. Jackson's Add'l Facts ¶ 33.) Jackson testified that nine times out of ten when he worked through lunch he told his supervisors about it. (Id. ¶ 46.) When

---

[3] All technicians began using Comcast's computer program identified as Employee Self Service to record their time starting at the end of 2008 or beginning of 2009. (R. 176, K. Jackson's Resp. to Defs.' Facts ¶ 15.)

15

Jackson returned home after a shift, he spent five to seven minutes securing his vehicle and putting equipment away. (R. 176, K. Jackson's Resp. to Defs.' Facts ¶¶ 61, 63.) On occasion he spent a half hour to an hour performing tasks post-shift in his role as lead technician. (R. 206, Defs.' Resp. to K. Jackson's Add'l Facts ¶ 50.)

Jackson testified that he feels "like a prisoner" during on-call shifts because he has to "sleep light" in case a call comes in and because working from 3:00 p.m. until midnight before going on-call until 7:30 a.m. prevented him from seeing his children. (R. 176, K. Jackson's Resp. to Defs.' Facts ¶¶ 69, 72-73.) Jackson reported being called out for 12.5% of the total hours he spent on call during the relevant period. (R. 206, Defs.' Resp. to K. Jackson's Add'l Facts ¶ 56.)

### 5. Michael Jackson

Michael Jackson has worked as a line technician for Comcast since 2009, working a regular schedule of 7:30 a.m. to 4:30 p.m., Sunday through Thursday. (R. 179, M. Jackson's Resp. to Defs.' Facts ¶¶ 1, 6.) He worked as a home dispatched technician from 2009 until "maybe 2011," and has worked as a home garaging technician out of the 112th Street facility since then. (Id. ¶ 7.) Jackson testified that he usually logs into his computer between 6:20 a.m. and 6:30 a.m. each work day because it can take 20 to 30 minutes to boot up the computer and review his assignments on Watchtower. (Id. ¶¶ 30-31.) He also spends 20 to 25 minutes performing a vehicle inspection before the start of his shift. (Id. ¶ 36.) Jackson testified that he typically emails and texts during his lunch breaks. (Id. ¶ 48.) If he receives a message about an outage, he has to respond to the

communication within five to ten minutes. (Id. ¶ 49.) After his shift ends, Jackson spends 20 to 25 minutes securing his equipment, inspecting his vehicle, and taking equipment inside his house. (Id. ¶¶ 56-57.)

Jackson testified that he works a seven-day on-call shift every eight weeks. (Id. ¶ 65.) His understanding of his responsibility while on call is that he is required to respond to a text message within 30 minutes and must resolve the outage within 90 minutes. (Id. ¶ 69.) He testified that in theory an on-call employee could watch television, spend time with family, read, watch ball games, go to the grocery store, and run quick errands. (Id. ¶ 72.) Jackson reported being called out for about 41% of all of the hours he spent on call. (R. 195, Defs.' Resp. to M. Jackson's Add'l Facts ¶ 48.)

Jackson testified that after attending a November 2011 ESS training about pay, he and other technicians attended a meeting with Espinosa in which they said they should be getting paid for the time they spend turning on their computers. According to Jackson, Espinosa said, "I advise you guys not to do that." (R. 179, M. Jackson's Resp. to Defs.' Facts ¶ 39.) Jackson also testified that at that meeting "[w]e were told not to put the time down for performing [the pre-shift] work." (R. 216, Sur-Reply ¶¶ 36, 38.) After that meeting, Jackson did not try to record time he spent working pre-shift or time he spent monitoring texts and emails during lunch. (R. 179, M. Jackson's Resp. to Defs.' Facts ¶¶ 42, 52.)

### 6.    Jose Vigil

At all relevant times Jose Vigil has worked as a line technician for Comcast on a Tuesday to Saturday, 7:30 a.m. to 4:30 p.m. schedule. (R. 182, Vigil's Resp. to Defs.' Facts ¶¶ 1, 8.) Originally Vigil worked as a home dispatched technician, but starting in February 2013 he began working as a home garaging technician. (Id. ¶ 9.) While working as a home garaging technician, Vigil would typically arrive at the 112th Street facility around 6:10 a.m. (R. 202, Defs.' Resp. to Vigil's Add'l Facts ¶ 32.) Vigil testified that before the 7:30 a.m. start of his shift, he spends about 10 to 15 minutes turning on his computer and entering his time and then monitors Watchtower to see how many jobs are available. (R. 182, Vigil's Resp. to Defs.' Facts ¶¶ 33-34, 36-37.) He does not record the time he spends monitoring Watchtower. (Id. ¶ 39.) Vigil also spends approximately 10 minutes synchronizing his meter with his supervisor's computer before his shift starts. (Id. ¶ 42.) He does not record that time either. (Id. ¶ 43.) He also spends "maybe a half hour" of unreported time completing a pre-shift vehicle inspection. (Id. ¶¶ 44-45.) As for lunch breaks, Vigil testified that prior to December 2012 or February 2013, he worked through lunch. (Id. ¶ 50.) At the end of his shift, Vigil spends about 30 minutes putting away his equipment and sending an email describing the day's job. (Id. ¶ 64.) Even if he completes those activities after 4:30 p.m. he does not record the time as overtime because his supervisors push too much for the technicians to stay on a 7:30 a.m. to 4:30 p.m. schedule. (Id. ¶¶ 67-68.) Vigil is required to work a seven-day on-call shift approximately every four to six weeks. (R. 202, Defs.' Resp.

to Vigil's Add'l Facts ¶ 52.)  Vigil reported being called out for about 45% of the hours he spent on call.  (R. 204-4, Defs.' Resp. to Farmer's Add'l Facts Ex. C, DiGiovanni Decl. ¶ 8.)

Sometime between December 2012 and February 2013, Espinosa called Vigil and told him he noticed that Vigil was recording nine straight hours of work, and instructed him to stop and take his lunch.  (R. 182, Vigil's Resp. to Defs.' Facts ¶ 54.)  Starting around then, Vigil would monitor Watchtower during his lunch break and if he saw an outage in his area, he would call his supervisor to find out whether he should suspend his lunch and address it.  (Id. ¶¶ 59-63.)

### 7.    Chris Woodard

Chris Woodard worked as a home garaging Comcast line technician starting in August 2011.  (R. 185, Woodard Resp. to Defs.' Facts ¶¶ 1, 10.)  Woodard testified that he was required to arrive at the 112th Street facility by 7:30 a.m. to start his shift, but he would conduct "pre-trip" vehicle inspections required by the Department of Transportation before leaving in the morning.  (Id. ¶¶ 30-32.)  He would also log into Watchtower, a process that took between 20 to 30 minutes.  (Id. ¶¶ 33-34.)  He was never told to log in before his shift started.  (Id. ¶ 38.)  Woodard testified that most of the time he took a lunch break and that he was paid for time he worked through lunch if he recorded it.  (Id. ¶¶ 42-43, 45.)  There were times Woodard worked through lunch without recording his time because he was told not to skip his lunch and there were times he could not leave the customer for a lunch break.  (Id. ¶ 46.)  If he received a communication about an outage in his area

19

during a lunch break, Woodard would respond to the outage and then restart his lunch after it was resolved.  (Id. ¶ 48.)  It took him "[m]aybe a minute" to review his messages during his lunch break.  (Id. ¶ 50.)  Woodard never told anyone that he was working through lunch and not recording it.  (Id. ¶ 52.)  Woodard also spent five to ten minutes after the end of a shift securing his truck, shutting down his laptop, and putting equipment away.  (Id. ¶¶ 55-58.)  He said that he would spend 15 to 20 minutes dropping off bad equipment at the 112th Street facility after his shift ended.  (R. 208, Defs.' Resp. to Woodard's Add'l Facts ¶ 42.)

Woodard worked a seven-day on-call shift on a "normal rotation" every month or a month and a half, but he was sometimes asked to volunteer for extra call shifts.  (R. 185, Woodard Resp. to Defs.' Facts ¶ 61.)  Woodard ran personal errands in his Comcast vehicle while he was on call.  (Id. ¶ 65.)  He often skipped church services while on call because he did not know whether he would be called in.  (Id. ¶ 71.)  He also said that he had to have his cell phone with him at all times while on call and that he would keep his laptop on while on call at home to monitor the system.  (R. 208, Defs.' Resp. to Woodard's Add'l Facts ¶ 51.)  Woodard was called out for approximately 42.9% of the on-call hours he worked from the period between August 2011 and February 2013.  (Id. ¶ 50.)  He was called out more than once a day on nine of the thirty-nine days that he was called out.  (Id. ¶ 49.)

Woodard testified that he brought up with his supervisors in at least three meetings whether it would be permissible for him to record the time he spent before the start of his shift, but they told him not to do so.  (Id. ¶ 31.)  According to

20

Woodard, they told him to record his start time as 7:30 a.m. (Id. ¶ 34.) Woodard also testified that he complained to his managers that they were logging him out while he was still on the job, but they responded that they only had a certain amount of overtime to authorize. (Id. ¶ 44.)

## Analysis

This court will grant summary judgment only where the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the moving party meets its burden of pointing to materials that "it believes demonstrate the absence of a genuine issue of material fact," the responding party must point to "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323-24. Although the facts will be reviewed in the light most favorable to the non-moving party, *see Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011), the "mere existence of a scintilla of evidence in support of the [non-movant's] position" is insufficient to defeat a motion for summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Instead, to overcome a well-supported motion for summary judgment, there must be a genuine dispute over facts from which a reasonable jury could find in the plaintiffs' favor. *See id.* at 247-48, 252.

The plaintiffs seek to proceed to trial on their claims that Comcast violated the FLSA and IMWL by failing to pay them overtime wages for time they spent working before their shifts started, during what would otherwise be a lunch break,

after their shifts ended, and while waiting to be called in during on-call shifts. Both the FLSA and the IMWL require employers to pay their non-exempt employees one and one-half times their regular hourly wage for hours spent working beyond 40 hours in one week. 29 U.S.C. § 207(a)(1); 820 ILCS § 105/4a(1). The parties agree that the IMWL parallels the FLSA and so the same analysis applies to both claims. *See Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011). The plaintiffs bear the burden of proving that they performed overtime work for which they were not properly compensated. *See Kellar*, 664 F.3d at 173.

## A.    The On-Call Claims

Comcast's assertion that it is entitled to summary judgment with respect to the plaintiffs' on-call claims is the most straight forward of its arguments from a factual perspective, so the court will begin there. Comcast argues that because it places no restrictions on how line technicians spend their time during on-call shifts—other than to require them to remain sober and to respond to calls to repair outages within 30 minutes—that time is not compensable as working time under either the FLSA or IMWL. All of the plaintiffs respond by arguing that the frequency with which they are called to jobs during on-call shifts, coupled with the call response time requirements and the threat that they could be forced to undergo drug and alcohol screenings while on call, means that they are unable to use their time effectively for personal pursuits. Accordingly, the plaintiffs argue that the undisputed facts show that they are entitled to their regular or overtime compensation for all of the hours they spend on call.

22

Under certain circumstances, time spent waiting to work while on call may constitute working time under the FLSA. *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). Whether time spent on call is compensable as work under the FLSA turns on whether the employee is "engaged to wait" or is "waiting to be engaged." *See Dinges v. Sacred Heart St. Mary's Hosps., Inc.*, 164 F.3d 1056, 1056-57 (7th Cir. 1999) (citing *Armour*, 323 U.S. 126 & *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). The Labor Department has codified the concept as follows:

> [a]n employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.' An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.

29 C.F.R. § 785.17; *see also Jonites v. Exelon Corp.*, 522 F.3d 721, 723 (7th Cir. 2008). There is no one legal formula that dictates whether waiting time is compensable, *see Skidmore*, 323 U.S. at 136, but courts have looked to a number of factors to help settle the question, including the following: whether the employee's movements were subject to excessive geographical restrictions; whether the frequency of call-ins created undue restrictions; whether there was a fixed timeframe for responding to a call; and whether the employee actually engaged in personal activities while on call. *Cleary v. ADM Milling Co.*, 827 F. Supp. 472, 475 (N.D. Ill. 1993). At the end of the day, whether time spent on call is compensable hinges on the on-call employee's freedom to devote his time effectively "to the ordinary activities of private life." *See Dinges*, 164 F.3d at 1057; *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 677 (5th Cir. 1991) (en banc).

23

Here, the plaintiffs all argue that the speed with which they had to respond to a page (approximately five to ten minutes) and the thirty-minute window to report to work after responding to a page, together with the requirement that they stay with their Comcast vehicle during on-call shifts, severely restrict their ability to engage in personal activities. But courts have found similar conditions insufficient to demonstrate the compensability of on-call time. For example, in *Dinges*, the plaintiff emergency medical technicians were required while on call to arrive at the hospital within seven minutes of receiving a page. 164 F.3d at 1057. That restriction prevented on-call employees from attending holidays with relatives, engaging in out-of-town leisure activities, or running errands outside a seven-mile radius from the hospital. *Id.* Despite those restrictions, because the plaintiffs had less than a 50% chance of being called in during each on-call shift and they could still sleep, care for family members, and attend local events, the court concluded that their on-call time was not work time. *Id.* at 1058-59. Similarly, in *Bright*, the plaintiff was required to remain reachable by beeper and to stay within a 20-minute radius of his employer while on-call. 934 F.2d at 673. Likewise, the Eighth Circuit determined that such restrictions did not prevent the plaintiff from effectively using his on-call time for his own purposes even though he would have been able to do more things had the on-call restrictions been more forgiving. *Id.* at 678. In *Birdwell v. City of Gadsen, Ala.*, 970 F.2d 802, 807 (11th Cir. 1992), plaintiff police officers sought compensation for a one-week period in which they were required to be immediately reachable for a call-in to respond to a workers' strike. The officers

24

presented evidence that although they could leave their homes, they could not leave town, go on vacation, participate in outdoor activities, or go anywhere with family members without driving two cars. *Id.* at 808. The Eleventh Circuit held that these restrictions on the officers' free time were insufficiently severe to treat the on-call time as work time, because they "could do anything they normally did so long as they were able to respond to a call promptly and sober." *Id.* at 810.

The undisputed facts here show that the limitations on the plaintiffs during their on-call shifts were no more restrictive than those placed on the plaintiffs in *Dinges*, *Bright*, or *Birdwell*. Although Comcast policy required that the plaintiffs respond to an outage within 30 minutes of communicating with Comcast regarding the outage, that limitation is significantly more forgiving than the 7-minute reaction time the Seventh Circuit concluded was insufficient to convert waiting time into working time in *Dinges*. Several plaintiffs testified that being on call disturbed their regular routine, but the test is whether they could conduct normal activities of private life while on call, not whether they could do so without any inconvenience or in the precise way they do outside of their on-call shifts. *See Bright*, 934 F.2d at 677 (noting that employee need not "have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject"). For example, Michael Jackson complains that because he works from three p.m. until midnight while he is on call, he is unable to see his children because they do not get home from school until after three. But that is a complaint about the

inconvenience involved in his particular schedule, not about the restrictions placed on him during what would otherwise be downtime. Significantly, several of the plaintiffs testified that they are able to sleep, watch television, spend time with friends or family, shop for groceries, run errands, or make home repairs while waiting to be called in during on-call shifts. (See, e.g*.,* R. 167, Brand's Resp. to Defs.' Facts ¶ 74; R. 170, Farmer's Resp. to Defs.' Facts ¶ 80; R. 179, M. Jackson's Resp. to Defs.' Facts ¶ 72 (agreeing that he could do these types of activities at least in theory while on call); R. 185, Woodard's Resp. to Defs.' Facts ¶ 65.) That testimony belies a finding that the plaintiffs' free time while on call was so severely restricted that it constituted work time for purposes of the FLSA. *See Aiken v. City of Memphis, Tenn.*, 190 F.3d 753, 760 (6th Cir. 1999).

The plaintiffs also rely heavily on the frequency with which they were called in during on-call shifts to support their assertion that they are unable to use their time effectively to engage in personal pursuits while on call. In *Dinges*, the Seventh Circuit found significant the fact that the plaintiffs were called in during fewer than 50% of their on-call shifts in concluding that their wait time was not compensable. 164 F.3d at 1058. Here, the plaintiffs have not provided clear evidence regarding the percentage of days on which they were on call that they were called in to work. There is evidence, however, that on the days they were called in the plaintiffs were typically only called in once. (See, e.g., R. 208, Defs.' Resp. to Woodard's Add'l Facts ¶ 49; R. 186-20, Pls.' Ex. 20, Comcast Wage Doc. 00042586.) That fact "mitigates against a conclusion that the on-call time was spent predominantly for the benefit"

26

of Comcast. *See Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001); *compare with Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1532, 1537-38 (10th Cir. 1991) (frequency of callbacks suggested on-call time compensable where plaintiff firefighters called back on average between three and five times and sometimes thirteen times per shift). Additionally, Comcast has submitted evidence, which the plaintiffs have not disputed, (*see supra* pg. 10 n.2), showing the following with respect to the percentage of hours that the plaintiffs worked during their on-call shifts:

| Plaintiff[4] | Percentage of On-Call Shift Hours Called In |
|---|---|
| James Brand | 54.6 |
| Barry Farmer | 37.7 |
| Kevin Jackson | 12.5 |
| Michael Jackson | 40.3 |
| Jose Vigil | 45.1 |
| Christopher Woodard | 42.9 |

(R. 204-4, Defs.' Resp. to Farmer's Facts Ex. C, DiGiovanni Decl. ¶ 8.) Thus, the only plaintiff who worked more than half of the time he spent on call was Brand, and he worked just over 50% of his on-call time. But even the proportion of hours the plaintiffs spent working while on call here is insufficient to trump the other factors pointing clearly to the conclusion that the plaintiffs could do as they saw fit with their on-call time. As a point of comparison, in *Jonites* the employer required off-duty employees (not just on-call employees) to be reachable by phone at all times to respond to emergency calls and disciplined employees who failed to answer more

---

[4]   The declaration providing this data does not include information for Mark Graham, whose employment with Comcast ended in 2010.

than 50 percent of the calls or to accept more than 35 percent of the call outs. 522 F.3d at 722. That requirement forced the employees to stay within a two-hour radius of their normal duty station and prevented anyone whose response rate was near the floor from leaving town, even while off duty, without using vacation time. *Id.* at 724. Despite the fact that the employer's policy essentially kept employees tethered to their phones or beepers at all times, the *Jonites* court found the ensuing hardships insufficient to turn their off time into working time. *Id.* Here, the plaintiffs only had travel restrictions during their one-week on-call shifts, which they rotated through approximately every six weeks. Accordingly, the frequency with which they were subject to the inconveniences inherent in being on call is insufficient to push their on-call claims beyond the summary judgment stage.

Finally, the plaintiffs argue that their on-call shifts were unduly restrictive because "at any moment" during those shifts they could "be involuntarily transported and drug and alcohol tested <u>any time</u> they were 'on call.'" (R. 165, Brand Resp. Mem. at 14 (emphasis in original).) Courts have routinely held that on-call rules including a requirement that employees remain sober are insufficiently restrictive to convert their on-call time to work time. *See, e.g.*, *Reimer*, 258 F.3d at 725; *Dinges,* 164 F.3d at 1057; *Bright,* 934 F.2d at 673; *Birdwell,* 970 F.2d at 808. Additionally, here all of the plaintiffs cite the same set of undisputed facts to suggest that they are subject to random drug and alcohol tests at any time during their on-call period. Those facts show that on a single occasion, a Comcast line technician was removed from a bar and grill and subjected to drug and alcohol

testing by managers who saw his Comcast truck parked outside and suspected he had been drinking. (R. 197, Defs.' Resp. to Brand's Add'l Facts ¶ 52.) Comcast policies prohibit line technicians from driving after consuming alcohol. (Id.) None of the plaintiffs submit any evidence that they or any other line technician has been brought in for alcohol or drug testing randomly or absent a manager's suspicion that the employee was about to drive a Comcast vehicle after drinking. Accordingly, they have not shown that there is anything different about Comcast's requirement that they remain sober while on call from the cases finding such restrictions insufficient to transform on-call time into work time. For all of these reasons, the court concludes that Comcast is entitled to summary judgment with respect to the plaintiffs' claims for on-call compensation.

**B.     Pre-Shift and Post-Shift Activities**

Comcast also seeks summary judgment on the plaintiffs' claims that they are entitled to overtime compensation for the time they spent or spend engaged in certain activities before the beginning and after the end of their regular shifts. According to Comcast, the plaintiffs' claims are barred by the Portal-to-Portal Act ("PPA"), 29 U.S.C. § 254, as amended by the Employee Commuting Flexibility Act of 1996 ("ECFA"), 29 U.S.C. § 254(a), because all of the pre- and post-shift activities for which they seek compensation are, according to Comcast, activities which are incidental to the use of Comcast's vehicles for commuting. The plaintiffs argue that their pre- and post-shift activities are compensable regardless of the ECFA because, they say, those activities are indispensable and integral to their principal activities,

or alternatively, because Comcast has established a custom or practice of compensating line technicians for such activities. For the following reasons, this court concludes that Comcast is entitled to summary judgment with respect to the pre-shift and post-shift claims.

### 1. Incidental versus Indispensable Activities Under the PPA

The plaintiffs seek compensation for unrecorded time they spent before and after their shifts logging into their computers, obtaining and reviewing assignments electronically, conducting vehicle inspections, and loading, unloading, or securing equipment in and from their Comcast vehicles. The PPA narrowed the scope of employer liability under the FLSA by excepting from coverage two activities that previously had been treated as compensable: "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." *See* 29 U.S.C. § 254(a). Although the PPA did not define "principal activity," the Supreme Court has interpreted the term to embrace "all activities which are an integral and indispensable part of the principal activities." *See Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513, 517 (2014) (internal quotation marks and citation omitted). In 1996, Congress amended the PPA by passing the ECFA, which clarifies the rules regarding payment for time employees spend using employer-provided vehicles for their commute. *See* H.R. Rep. No. 104-585, at 2 (1996). The ECFA excludes

payment for the time an employee spends commuting and engaged in activities that are incidental to commuting:

> the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

29 U.S.C. § 254(a). Thus, as amended by the ECFA, the PPA carves out from the FLSA time employees spend engaged in activities that are incidental to their use of a company vehicle, as long as the employees' use of the vehicle is subject to an agreement with the employer and the vehicle is used for travel within the normal commuting area for the employer's business. *Id.*; *see also Rutti v. Lojack Corp.*, 596 F.3d 1046, 1052 (9th Cir. 2010). In other words, if activities are "integral and indispensable" to the employees' principal activities, then they are compensable, but if, on the other hand, they are "incidental" to the use of a company vehicle for commuting, they are not. *See Chambers v. Sears Roebuck & Co.*, 428 Fed. App'x 400, 414 (5th Cir. 2011).

There is no dispute here that in their capacities as home dispatched or home garaging line technicians the plaintiffs used their Comcast vehicles within a normal commuting area and subject to an agreement with Comcast. The parties disagree, however, over whether the pre- and post-shift activities underlying their FLSA claims are incidental to their use of those Comcast vehicles for commuting, or are, as the plaintiffs argue, integral and indispensable to their principal activities as

31

line technicians.  Comcast argues that all of the activities described by the plaintiffs are carved out of the FLSA's compensation requirements by the ECFA because, they say, those activities are incidental to the plaintiffs' commute driving a Comcast-issued vehicle.  *See* 29 U.S.C. § 254(a).  Although the ECFA does not define the term "incidental," its legislative history provides some guidance.  The House Report acknowledges that it "is not possible to define in all circumstances what specific tasks and activities would be considered 'incidental' to the use of an employer's vehicle for commuting."  H.R. Rep. No. 104-585, at 5 (1996).  But it makes clear that "[c]ommunication between the employee and employer to receive assignments or instructions, or to transmit advice on work progress or completion, as well as "routine vehicle safety inspections or other minor tasks" are included among the incidental activities which are not compensable under the ECFA.  *Id.*

Courts that have wrestled with the task of separating incidental activities from compensable ones in this context have repeatedly placed activities like those described by the plaintiffs into the category of activities that are incidental to the employees' commute.  In *Chambers*, for example, the plaintiffs sought compensation for time spent logging into a device to learn their first assignment, carrying the device to their company vehicle and plugging it in before driving to their first service call, unplugging the device and transporting it to their houses from the van at the end of the day, and plugging it in to upload information regarding the current day's stops and the next day's assignment.  428 Fed. App'x at 415-17.  Noting that the House Report to the ECFA included communications to receive assignments as

among the activities that are incidental to a commute, the court concluded that the activities the plaintiffs described all "relate to the employee's commute," and thus are non-compensable under the ECFA.[5]  *Id.* at 417; *see also Donatti v. Charter Commc'ns, LLC*, 950 F. Supp. 2d 1038, 1053 (W.D. Mo. 2013) (finding time spent carrying equipment between company vehicles and the employees' homes incidental to commute).  Similarly, in *Rutti*, 596 F.3d at 1057, the Ninth Circuit concluded that time a car alarm technician spent before his shift "receiving, mapping, and prioritizing jobs and routes for assignment" was incidental to his commute rather than integral to his principal activities.  As another court reasoned, checking assignments early enough to ensure that the employee allots sufficient time for his commute to his first job is "by its very nature" incidental to the employee's use of a company vehicle.  *Donatti*, 950 F. Supp. 2d at 1054.  Courts have also held that cleaning, maintaining, and performing routine safety inspections of company vehicles are activities that should be considered incidental to the employee's use of a company vehicle.  *See, e.g.*, *Aiken*, 190 F.3d at 759 (finding tasks involved in keeping vehicles clean and scheduling maintenance incidental to commute); *Butler v.*

---

[5]  It should be noted that the amount of time the plaintiffs in *Chambers* spent on some of their pre- and post-shift tasks was significantly shorter than the time the plaintiffs spent on similar tasks here.  In addition to finding that these tasks are carved out by the ECFA, the *Chambers* court concluded in the alternative that those tasks were noncompensable because they were *de minimus*.  *Id.* at 418.  But the plaintiffs here have not developed any argument that their commute-related activities are rendered compensable by the amount of the employees' time they absorb.  Nor have they argued that the relatively lengthy duration of these tasks supports a conclusion that they are principal activities.  Accordingly, this court has cabined its analysis to Comcast's argument that the tasks at issue here are incidental to the plaintiffs' commute within the meaning of the ECFA.

*DirectSat USA, LLC*, 55 F. Supp. 3d 793, 807-09 (D. Md. 2014) (finding time spent reading emails regarding schedule, prioritizing routes, or maintaining vehicle not compensable); *Donatti*, 950 F. Supp. 2d at 1053 (finding time spent quickly inspecting company vehicle and removing and replacing hazard cones from around the vehicle incidental to commute).

The pre- and post-shift tasks for which the individual plaintiffs seek compensation here are remarkably similar to those found to be incidental to the employees' commute in the cases discussed above. The plaintiffs all described their pre- and post-shift activities in similar terms. For example, in discussing their pre-shift claims, all of the plaintiffs described turning on their computers and logging in at least a half hour before the start of their shifts for the purpose of reviewing or obtaining their assignments for the day. They also testified that they spent anywhere from five minutes (Kevin Jackson) to thirty minutes (Vigil) performing safety inspections of their Comcast vehicle before the start of their shifts. These kinds of routine tasks related to obtaining assignments electronically and performing vehicle safety inspections are inherently incidental to the plaintiffs' choice to use Comcast vehicles as their method of commuting. *See, e.g., Rutti*, 596 F.3d at 1057. As for post-shift activities, all of the plaintiffs described spending time securing their Comcast vehicles and putting away equipment for safekeeping. That process took them anywhere from five to thirty minutes, depending on the line technician and the day, although Farmer and Vigil both testified that they sometimes perform these tasks before their shift ends. Additionally, Brand,

34

Farmer, and Vigil testified that they sometimes spend time at or after the end of their shift sending emails, logging miles or recording time, and logging out of their computers. But time spent communicating with a supervisor to report on a last service call or uploading information about the day's work are the kinds of communications incidental to a commute that the ECFA carves out. *See Buzek v. Pepsi Bottling Grp., Inc.*, 501 F. Supp. 2d 876, 877, 883 (S.D. Tex. 2007).

In their response, the plaintiffs fail to explain why the tasks they identify here are qualitatively different than the kinds of pre- and post-shift tasks that many courts have found to be incidental to the use of a company vehicle. Instead of acknowledging or distinguishing the case law suggesting that the pre- and post-shift activities the plaintiffs describe here should be categorized as incidental to their commute under the ECFA, the plaintiffs rely entirely on the Supreme Court's recent decision in *Integrity Staffing* to argue that these activities are integral and indispensable to their principal activities as line technicians. (See, e.g., R. 165, Brand Resp. Mem. at 12-13.) But *Integrity Staffing* has nothing to do with tasks related to commuting in a company vehicle. Instead, *Integrity Staffing* addresses the question of whether the 25 minutes plaintiff warehouse employees spent waiting for and undergoing security screenings at the end of their shifts is compensable under the FLSA. *Id.* at 515. The employees argued that this time was "solely for the benefit of the employers and their customers" and therefore was indispensable to their principal activities as warehouse workers. *Id.* at 515-16. The Supreme Court rejected that argument, and concluded that the security screenings

were "noncompensable postliminary activities." *Id.* at 518. The Supreme Court made clear that the test for whether an activity is indispensable to a principal activity does not focus on "whether an employer *required* a particular activity." *Id.* at 519 (emphasis in original). Instead, "an activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.*

Here, the plaintiffs assert that *Integrity Staffing* supports their pre- and post-shift claims because they could not have performed their job duties as line technicians without performing tasks like logging in to obtain assignments, performing vehicle checks, and securing their equipment. But that argument is a non-starter because *Integrity Staffing* does not deal with the ECFA. To suggest that an activity can be incidental to a commute under the ECFA but still be compensable because it is integral to a principal activity would render the ECFA meaningless. *Chambers*, 428 Fed. App'x at 414 n.38; *Buzek*, 501 F. Supp. 2d at 885 (noting that cases not involving employee commutes are not "on point" in determining whether commute-related activities are compensable). Even putting aside that the discussion in *Integrity Staffing* does not relate to the ECFA, the plaintiffs have provided no argument to support their assertion that a line technician could not dispense with the relevant tasks and still perform their job. It is clear that Comcast required these tasks, and that they were necessary by-

36

products of the plaintiffs' use of Comcast vehicles in the course of their commute. But that is not the same as demonstrating that they are indispensable activities to the work Comcast employs them to perform—namely, repairing cable outages. "The fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity.'" *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40-41 (2005). Nor does the fact that a given task increases the efficiency of a principal activity mean that it is integral and indispensable to that activity. *Dinkel v. MedStar Health Inc.*, __ F. Supp. 3d __, No. 11-998, 2015 WL 1735078, at *3-4 (D.D.C. Apr. 16, 2015). The plaintiffs simply have not shown that the activities they point to are intrinsic aspects of the work of a line technician or are indispensable to that work. For these reasons, the court agrees with Comcast that under the ECFA, the pre- and post-shift activities the plaintiffs claim they engaged in here are incidental to their use of a Comcast vehicle for commuting purposes, and therefore are not compensable under the ECFA. *See* 29 U.S.C. § 254(a).

## 2. Custom or Practice of Compensation

The plaintiffs also argue that even if the ECFA would otherwise bar their claims for compensation with respect to their pre- and post-shift activities, they are nonetheless entitled to such compensation because, according to them, Comcast has a custom or practice of paying for these tasks. Subsection (b) of the PPA makes clear that even where activities might not otherwise be compensable, an employer may still be liable for the activity if it is made compensable by:

> a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.

29 U.S.C. § 254(b)(2); *see also IBP, Inc.*, 546 U.S. at 26. The applicable regulation explains that the terms "custom" and "practice" as used in this subsection "may be said to be descriptive generally of those situations where an employer, without being compelled to do so by an express provision of a contract, has paid employees for certain activities performed." 29 C.F.R. § 790.10(c). In that situation, what otherwise may be a noncompensable preliminary or postliminary activity may become compensable by way of the employer's established custom or practice. *See Jerzak v. City of South Bend*, 996 F. Supp. 840, 847 (N.D. Ind. 1998).

The plaintiffs all argue that their pre- and post-shift activities have been made compensable under 29 U.S.C. § 254(b)(2) by way of Comcast's written employment policies stating that line technicians will be compensated for such activities as logging into and out of computers, picking up equipment, conducting daily vehicle inspections, and engaging in job-related communications with supervisors, co-workers, or customers, among other things. (See, e.g., R. 165, Brand's Resp. Mem. at 11.) As additional evidence of a custom or practice, they point to Comcast's Payroll Manager's testimony that line technicians begin their workday "the minute they start anything related to Comcast business, whether it's reading a piece of paper, logging into a mobile device . . . . So the minute you begin your work day, whether that's logging into a computer, again, reading a document

38

left on your desk, you're on the clock."[6]  (Id. at 11-12.)  In arguing that these facts
suffice to establish a custom or practice within the meaning of the PPA, the
plaintiffs rely almost entirely on a previous decision rendered by this court in
another FLSA case.  In *Blakes v. Ill. Bell Tel. Co.*, 77 F. Supp. 3d 776, 781-82 (N.D.
Ill. 2015), the plaintiff cable splicers sought compensation for post-shift hours they
spent completing time sheets.  Based on the evidence submitted in that case, the
court concluded that the plaintiffs were entitled to survive summary judgment not
only because the relevant employee manual described that work as compensable,
but also because the facts showed that the defendant had a "long-standing
acquiescence to paying cable splicers for recording their time."  *Id.* at 781.
Specifically, the plaintiffs submitted evidence showing that the defendant's "policy
has been to compensate for timesheet entry, even if done post-shift, for at least as
long as electronic time entry has been in place."  *Id.*

In contrast to the situation in *Blakes*, here the plaintiffs have not amassed
sufficient evidence to allow a reasonable jury to conclude that their pre- and post-
shift commute-related activities have been rendered compensable by Comcast's
custom or practice.  Their reliance on the cited Payroll Manager testimony lends
them no aid because it simply describes how a line technician begins his or her day.
It does not describe a practice of paying line technicians for commute-related

---

[6]  The plaintiffs also assert that "Comcast admits that it has in fact paid for this
type of work in the past," but in support of that assertion they cite only generally to
Comcast's written policies. (R. 165, Brand Resp. Mem. at 12.)  The cited policies do
not support the assertion that Comcast has paid for these activities when they are
performed pre- or post-shift or where an employee fails to record those activities on
a time sheet.

activities that take place outside of scheduled shifts, and certainly not when the line technicians fail to report that time. Moreover, as Comcast points out, the plaintiffs' custom or policy argument cuts against arguments they make in other parts of their briefs regarding Comcast's refusal to pay for their pre- and post-shift activities. For example, the plaintiffs rely on evidence suggesting that Espinosa specifically directed them not to report time spent pre-shift on commute-related activities. Additionally, several of the plaintiffs opted into this suit based on the premise that Comcast has a "common and uniform trend" of not paying for the activities for which they now argue Comcast compensates line technicians as a matter of custom or policy. The plaintiffs cannot have it both ways at the summary judgment stage. *See Chambers*, 428 Fed. App'x at 422 (declining to find custom or practice of payment where "the very essence of Plaintiff's claims" was that employer did not compensate for commute-related activities).

At bottom, the only evidence the plaintiffs have put forward in support of their custom or policy argument is comprised of Comcast's written policies describing compensable work. The plaintiffs cite no cases in which a court has found that these kinds of general employment policies alone are sufficient to establish a legally binding obligation to compensate for time that is otherwise noncompensable. (See, e.g., R. 165, Brand Resp. Mem. at 11-12.) Nor have the plaintiffs explained why Comcast's policies describing compensable work create a custom or practice. The plaintiffs have not suggested that any such custom or policy is advanced by the requirements that make clear that line technicians must

report all of their time to be paid for it. The plaintiffs' claims stem from unreported time. Accordingly, Comcast's written policies are not enough to propel the plaintiffs past summary judgment based on a custom or practice theory for their FLSA claims, which are rooted in otherwise noncompensable activities.

It should be noted that the finding the plaintiffs advocate here—that an employer's general written employment policies alone may entrench a legally binding obligation to compensate employees for otherwise noncompensable and unreported activities—could lead to unintended and undesired consequences. For example, finding that Comcast's general employment policies create a legally enforceable obligation to pay for unreported time could lead employers to avoid providing work descriptions in writing, thus depriving employees of a clear understanding of what their employer considers to be qualifying work. It could also lead to arguments that an otherwise non-binding employee handbook is legally enforceable via the custom or practice route. Moreover, employers who are inclined to pay for certain kinds of commute-related activities might resist doing so out of a fear of unintentionally creating a legally binding custom or practice. For all of these reasons, the court agrees with Comcast that the plaintiffs have not pointed to sufficient evidence to survive summary judgment on their pre- and post-shift claims based on any custom or practice of payment for those activities. Accordingly, Comcast is entitled to summary judgment with respect to the plaintiffs' FLSA claims stemming from their pre- and post-shift activities.

**C.** **Compensation for Lunch-Break Work**

With respect to the plaintiffs' lunch-break claims, Comcast argues that it is entitled to summary judgment because, according to it, there is no evidence that it had either actual or constructive knowledge that the plaintiffs were working through lunch without pay. Alternatively, Comcast argues that even if the plaintiffs were able to show that Comcast was aware that line technicians were working through lunch, they have insufficient evidence to substantiate how often they worked without pay. According to Comcast, that lack of evidence entitles it to summary judgment because the plaintiffs' mere "speculation" is insufficient to show the amount or the extent of their unpaid overtime. For the following reasons, the court determines that only Brand and Kevin Jackson have submitted sufficient evidence to create a genuine issue of material fact with respect to Comcast's knowledge regarding unpaid lunch breaks and to allow a reasonable inference regarding the extent of that unpaid time.

**1.** **Comcast's Knowledge That Line Technicians Worked Through Lunch Breaks Without Pay**

To survive summary judgment with respect to their lunch-break claims, the plaintiffs must offer sufficient evidence from which a reasonable jury could conclude that Comcast had "actual or constructive knowledge" that they were working through lunch without pay. *See Kellar*, 664 F.3d at 177. The plaintiffs can show actual knowledge with evidence that Comcast "instructed them not to report overtime, told them to delete overtime that they reported on their timesheets or refused to pay them for reported overtime." *Boelk v. AT&T Teleholdings, Inc.*, No.

12-cv-40-bbc, 2013 WL 3777251, at *7 (W.D. Wis. July 19, 2013). An employer has constructive knowledge within the meaning of the FLSA when it "had reason to know" or "should have known" that its employees were not being compensated for work they performed. 29 C.F.R. § 785.11; *Kellar*, 664 F.3d at 177. "While an employer cannot slyly sit back in order to reap extra work without pay, it has no obligation to pay for work it did not know about and had no reason to know about." *Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 270 (7th Cir. 2014). Accordingly, in the absence of evidence of actual knowledge, the question becomes whether the plaintiffs' managers or supervisors "had the opportunity through reasonable diligence to acquire knowledge" that the plaintiffs were working through lunch without pay. *See Reich v. U.S. Dep't of Conservation & Nat. Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (internal quotation and citation omitted); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2004 WL 1882449, at *4 (N.D. Ill. Aug. 18, 2004).

The plaintiffs all first assert that Comcast requires them to monitor work devices during their lunch breaks and argue that this policy demonstrates that it had actual knowledge that they were working through lunch without pay. But the facts they cite do not support the assertion that Comcast requires them to continually and actively monitor their devices while on break. (See, e.g., R. 165, Brand Resp. Mem. at 15-16; R. 197, Defs.' Resp. to Brand's Facts ¶¶ 16-17.) As an initial matter, much of the deposition testimony they cite to support this assertion in their statements of additional facts has nothing to do with lunch breaks. (See,

e.g., R. 186-2, Brand Dep. at 211 (discussing pre-shift work); R. 186-7, Farmer Dep. at 67 (discussing pre-shift job assignments); R. 186-12, M. Jackson Dep. at 18 (same).)  Although the testimony they cite from Woodard, Vigil, and Kevin Jackson supports the suggestion that those plaintiffs sometimes receive outage notices via text, email, phone, or radio during lunch, Vigil and Woodard testified that if they receive such a communication, they suspend their lunch break and resume it later, if possible.  (R. 186-17, Vigil Dep. at 85-86 (noting that he does not have to respond to an outage during lunch); R. 186-19, Woodard Dep. at 140 (stating that it was "not often" that he received a communication during lunch).)  Moreover, Vigil testified that no manager ever told him he had to watch his computer for communications during lunch and said that he does so because he has "nothing to do."  (R. 186-17, Vigil Dep. at 90.)  No reasonable jury could infer from the evidence the plaintiffs cite that Comcast has a blanket policy requiring them to actively monitor devices during lunch breaks and to respond immediately to communications regarding outages.  Accordingly, the cited testimony does not support the assertion that Comcast knew that the plaintiffs were working through lunch without pay simply because it knew that they occasionally received outage notices during their meal breaks.

Moreover, it should be noted that none of the cited testimony indicates that being ready to receive outage notices—even if a reasonable jury could infer that was Comcast's policy—required anything from line technicians beyond glancing at devices or listening for a notification when such a communication comes in.  The

plaintiffs have not argued that keeping a work device within earshot or their field of vision in case such a notification arrives prevents them from taking a bona fide meal break. Perhaps that is because relevant case law suggests that monitoring a radio or similar device is not a substantial job duty as long as the employee can still spend his lunch break primarily for his own benefit without persistent interruptions.[7] *See Ruffin v. MotorCity Casino*, 775 F.3d 807, 812 (6th Cir. 2015) (collecting cases finding that being available to respond to calls does not convert lunch break to work time). Accepting the plaintiffs' argument that Comcast had knowledge of uncompensated lunch-break work just because the plaintiffs monitored devices during lunch would mean that no line technician has ever had a bona fide lunch break for as long as Comcast's outage-response policy has been in place. Not even the plaintiffs have suggested that to be the case. Accordingly, this court disagrees that line technicians' duty to monitor their devices so as to be able to respond to outages on its own translates to a reasonable conclusion that Comcast had actual knowledge that the plaintiffs were working through their lunch breaks without pay.

To support their argument that Comcast had constructive knowledge of unpaid overtime, the plaintiffs also collectively point to a "variety of complaints" that Comcast received from 2008 to 2012, which the plaintiffs characterize as being

---

[7] In a footnote, (see, e.g., R. 165, Brand Resp. at 16 n.3), the plaintiffs assert that Comcast has not argued that their lunch breaks are noncompensable as a matter of law, but it is their burden to prove that their meal periods are compensable. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) (*superseded by statute on other grounds as stated in IBP*, 546 U.S. at 41).

about unpaid lunch breaks.  Given that the plaintiffs devoted only two sentences to this argument without explaining how the facts they cite in support demonstrate constructive knowledge, (see, e.g., R. 165, Brand Resp. at 16), the court will not linger long here.  Suffice it to say that none of the anonymous complaints that came in to a service technician manager, the Department of Labor, human resources, or the Comcast Listens Helpline directly involved complaints that the plaintiffs were working through lunch or that the plaintiffs' managers or supervisors knew or should have known that these specific plaintiffs were working through lunch without pay.  (R. 166, Brand Add'l Facts ¶¶ 20-28); *see Boelk*, 2013 WL 3777251, at *10 (determining that evidence suggesting managers should have known that unidentified technicians were working through breaks without pay was insufficient to put managers on notice that the named plaintiffs were working through breaks).  Even the complaint that supervisor Espinosa was pressuring line technicians regarding their work hours was directed at unpaid pre-shift work, not lunch breaks.  (R. 166, Brand's Add'l Facts ¶ 24.)  Accordingly, the court will focus on the facts submitted by the individual plaintiffs to determine whether there exists sufficient evidence from which a reasonable jury could conclude that Comcast had actual or constructive knowledge that the plaintiffs were working through lunch without pay.

### a.   Brand

In addition to the generic evidence outlined above in support of his argument that Comcast knew or should have known that he was working through lunch, Brand submitted evidence that human resources personnel and supervisor Johnson

not only knew but instructed him not to report that he was working through lunch. Specifically, Brand testified that a person from human resources told him and other line technicians that "you have to put down your one-hour lunch break . . . whether you take your lunch or not, you have to put down your one-hour lunch break." (R. 166, Brand's Add'l Facts ¶ 40; R. 186-2, Brand Dep. at 66:22-67:12, 279:14-21.) Brand testified that Johnson was present when Brand received that instruction. (R. 186-2, Brand Dep. at 68:2.) He also testified that he told his managers and supervisors "a lot" that he was not able to take a lunch break because of the amount of work on his plate and said that if he called Johnson to relay that he was unable to take a lunch on a given day, Johnson would say "well, you know, you should have took it." (Id. at 280:11-281:18.) Because a supervisor's knowledge is imputed to the employer, *see Cunningham v. Gibson Elec. Co., Inc.*, 43 F. Supp. 2d 965, 975 (N.D. Ill. 1999), Brand's testimony that he was instructed in the presence of his supervisor not to record time he spent working through lunch, coupled with his supervisor's awareness that Brand was frequently working through lunch, is more than sufficient to create at least a genuine issue of material fact as to whether Comcast knew or should have known that Brand was not being paid for all of the lunch breaks he worked through.

### b. Farmer

Farmer's evidence regarding Comcast's knowledge is far weaker than Brand's and fails to raise a genuine issue of fact as to whether his supervisors or managers knew or should have known he was working through lunch without recording those

times. Farmer points to his testimony that he told his supervisor, Steve Rembis, that he was looking at assignments during his lunch break. (R. 169, Farmer's Add'l Facts ¶¶ 43-44; R. 186-7, Farmer Dep. at 90:3-90:16.) But Farmer testified that if Rembis asked him to cut his lunch break short to attend to a job, Farmer would suspend his lunch and resume his lunch break after he completed the assignment. (R. 186-7, Farmer Dep. at 93:1-93:17.) He also testified that he "may have spoken with Mr. Espinosa on occasions" during a lunch break, but admitted that he might not have said he was on lunch during those calls and Espinosa would not have known that he was interrupting his lunch break. (Id. at 90:18-91:6.) When asked how his supervisor would know whether he worked through his lunch break, Farmer responded "I guess he wouldn't. Other than the fact that they can see when we go on and off a job and see our clocks even though we try to keep it—the paperwork stable." (Id. at 168:15-21.) Farmer has made no attempt to explain what he meant by his supervisors being able to see when he goes on or off a job. That Farmer's supervisors may have had access to technology that would allow them to determine whether he was working at any point in the day is insufficient in itself to demonstrate that they knew he was skipping his lunch breaks without reporting them. The question is not whether Comcast could have known, but whether it should have known. *See Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (noting that defendant's ability to investigate whether plaintiff truthfully recorded time not enough to establish constructive knowledge).

### c.  Graham

In support of his argument regarding Comcast's knowledge, Graham has submitted no evidence that he told his supervisors or managers that he was working through lunch or that they knew or should have known he was working through lunch without recording it and looked the other way.  The only testimony he cites in the section of his additional facts devoted to complaints about uncompensated meal breaks is his testimony that he did not record the times he worked through lunch because it "was a known thing" that it would not be approved and because he knew someone who was "beat up" for recording overtime during lunch.  (R. 172, Graham's Add'l Facts ¶¶ 40-41; R. 186-9, Graham Dep. at 49:3-50:14.)  But Graham admitted that neither of his supervisors, Johnson nor Espinosa, told him that he would not be compensated for working through lunch breaks, and he testified that he never told them that he had worked through lunch without recording it.  (R. 186-9, Graham Dep. at 49:22-50:6, 51:5-51:7.)  None of this testimony could support a reasonable jury's finding that Graham's supervisors were aware that he was working through lunch without pay.  Without more, Graham has not shown that Comcast had actual or constructive knowledge with respect to unpaid overtime during his lunch breaks.

### d.  Kevin Jackson

Kevin Jackson has submitted sufficient evidence to allow a reasonable jury to conclude that his supervisors had at least constructive knowledge that he had worked through lunch without pay.  Jackson testified that on one occasion when he

recorded that he worked through lunch, someone from payroll called him and told him to take and record a lunch break, and his time "should not reflect the fact that I didn't take a lunch break." (R. 175, K. Jackson Add'l Facts ¶ 45; R. 186-10, K. Jackson Dep. at 90:3-90:24.) Additionally, Jackson testified that "nine times out of ten" that he worked through lunch he would inform his supervisors, and Supervisor Rembis told him to "[m]ake sure your time sheet reflects that you had a lunch." (R. 175, K. Jackson's Add'l Facts ¶ 46.) Although this falls short of a direct instruction not to record time worked, a reasonable jury could infer from Rembis's reaction that he understood Kevin Jackson was working through lunch without compensation. Jackson also testified directly that he told Johnson that he was working through lunch without reporting it. (Id. ¶ 47.) On one occasion when Jackson told Johnson he had worked through lunch and asked whether he could leave early to compensate for that time, Johnson told him, "[n]o, you should have took lunch." (Id.) Given Jackson's testimony that he was told to record a lunch break whether or not he took it, coupled with his testimony that he repeatedly told his supervisors that he was working through lunch, he has offered sufficient evidence from which a reasonable jury could conclude that Comcast knew or should have known he was working through lunch without pay.

### e. Michael Jackson

Michael Jackson has not submitted sufficient facts to allow a reasonable jury to infer Comcast's knowledge regarding his work during meal breaks. Jackson testified that he typically tries to take a lunch break every day. (R. 186-12,

M. Jackson Dep. at 67:1-67:3.)  He testified that he could not recall a single day when he worked as a line technician and was unable to take a lunch.  (Id. at 67:11-67:14.)  He admitted that he never told his supervisors that he was checking emails or reading text messages during his lunch break.  (Id. at 67:22-68:2; R. 178, M. Jackson's Add'l Facts ¶ 41.)  In neither his response brief nor his statement of additional facts has Jackson pointed to any evidence to suggest that Comcast knew he was working through lunch.  In fact, by his own admission, he was unaware of a single day on which he did not take a lunch break.  That testimony precludes his FLSA claims with respect to unpaid lunch breaks.  *See Wilson v. City of Chi.*, No. 02 C 3379, 2004 WL 2095675, at *7 (N.D. Ill. Sept. 20, 2004) ("If Plaintiff himself cannot recall even a single instance in which he was required to perform police work during his lunch break, no reasonable jury could find that such instances occurred.").

### f.  Vigil

Similarly, Vigil's testimony precludes his lunch-break claim.  Vigil testified that when he starts his one-hour lunch break he emails his supervisors to let them know.  (R. 186-17, Vigil Dep. at 82:14-82:18.)  He testified that if an outage occurs in his area while he is on lunch he does not have to respond, and the supervisor gets someone else to take care of it.  (Id. at 85:10-85:22.)  Vigil also testified that if there is an outage in his area and he is on lunch, he might suspend his lunch and take it later in the day, if it is not too late.  (Id. at 86:3-86:12; R. 181, Vigil's Add'l Facts ¶ 45.)  Nowhere in his statement of facts does he point to any evidence that he was

instructed not to record time worked during lunch or that he told his supervisors he was not recording time he worked during a lunch break. In fact, he testified that when he suspends his lunch because of an outage, he resumes it later in the afternoon if he has time. (R. 186-17, Vigil Dep. at 88:18-88:15.) He has submitted no evidence to support a reasonable inference that his supervisors knew about any instances where he ran out of time to restart his lunch. These facts simply do not support an inference that Comcast had actual or constructive knowledge that Vigil worked through lunch breaks without pay.[8]

### g. Woodard

The only facts Woodard points to in his statement of additional facts to raise a genuine issue with respect to Comcast's knowledge pertain to times that his supervisors rejected his attempt to record time worked through a lunch break when he was a service technician. (R. 184, Woodard's Add'l Facts ¶¶ 39-40.) As Comcast points out, this is a case about unpaid overtime worked by the plaintiffs in their role as line technicians. Comcast observes that Woodard has opted into another collective action pending in this district bringing FLSA claims on behalf of Comcast service technicians. *See Elder, et al. v. Comcast Corp.*, No. 12 CV 1157, R. 85-1

---

[8] Vigil also argues that Comcast did not provide him with proper timekeeping training because although his first language is Spanish, the trainings were presented in English. Vigil asserts that there is no evidence that he actually understood that he was supposed to record all the time he worked. (R. 180, Vigil Resp. Mem. at 15.) Vigil has not brought any separate claim based on a failure to train, and there is no evidence that a language barrier caused Vigil to record his lunch-break time erroneously. In fact, he argues that he recorded the time as his supervisors instructed him to, without pointing to evidence that he misunderstood those instructions because of a language barrier. Accordingly, his training assertion does not help him fend off summary judgment with respect to his lunch-break claim.

(N.D. Ill.)  Woodard will not be allowed to use evidence regarding service technician supervisors' knowledge of unpaid work to demonstrate that Comcast knew or should have known that he was working without pay in his distinct role as a line technician.  Woodard also argues that management had at least constructive knowledge because the Watchtower database gave them the capability to monitor whether there were breaks between when he started and ended a job.  But again, the question is whether Comcast should have known, not whether it could have known.  *See Newton*, 47 F.3d at 749.  Because Woodard has not submitted any additional individual evidence to support his knowledge argument, Comcast is entitled to summary judgment with respect to his lunch-break claims.

### 2.    Damages

Finally, Comcast argues that it is entitled to summary judgment because the plaintiffs have insufficient evidence regarding the amount of unpaid overtime for which they now seek compensation.  The burden rests with the plaintiff to establish the amount of damages.  *Brown v. Family Dollar Stores of Ind., L.P.*, 534 F.3d 593, 595 (7th Cir. 2008).  In cases where the employer keeps time records that comply with the FLSA, "the accurate time records will establish the amount of damages, and the general rule that precludes recovery of uncertain and speculative damages is appropriate."  *Id.* (citing *Anderson*, 328 U.S. at 688).  But where the employer's records are not trustworthy, the employee can meet his burden of showing damages by proving "that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent

of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687; *see also Brown*, 534 F.3d at 597 (noting that just and reasonable inference standard applies where trustworthiness of employer records called into question). An employer's records may be deemed untrustworthy in circumstances where an employee's manager discouraged him from accurately recording time. *See Allen v. Board of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007). Under the just and reasonable standard, damages can "be reconstructed from memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013). Once the plaintiff meets this relaxed standard of proof, the burden shifts back to the employer to produce evidence that refutes the reasonableness of the inference. *Anderson*, 328 U.S. at 687-88.

Because only Brand's and Kevin Jackson's lunch-break claims have survived the previous analyses, the court will address only whether these two plaintiffs have submitted sufficient evidence from which a jury could calculate their damages. Both Brand and Jackson submitted evidence that they were instructed to record a lunch break whether or not they actually took one. Accordingly, they are entitled to show the amount and extent of their unpaid work under the relaxed "just and reasonable inference" evidentiary standard. *See Brown*, 534 F.3d at 597. Under this standard they may rely on their recollection, but not on speculation. *See Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 118 (S.D.N.Y. 2009). In fact, their recollection alone can satisfy this burden even where there is no

54

precise corroborating documentation or records. *See Blakes v. Ill. Bell Tel. Co.*, 75 F. Supp. 3d 792, 814 (N.D. Ill. 2014). To meet his burden Brand points to his testimony that during the relevant period he only took lunch breaks "maybe once or twice, maybe three times a month, if I was lucky." (R. 167, Brand's Resp. to Defs.' Facts ¶ 51.) Similarly, Jackson points to his testimony that he worked "[o]ver four years, probably three years' worth" of his lunches, and "70 to 75 percent of the time lunch was interrupted." (R. 175, K. Jackson's Add'l Facts ¶ 43.) The language they use about how often they "maybe" or "probably" worked through lunch suggests guesswork. They point to no explanation as to how they reached their estimates nor do they point to any memory "triggering factors" or other details providing the basis for their recollection. *See Brown*, 534 F.3d at 597. "Bare allegations and vague undocumented estimates" are insufficient to survive summary judgment. *Millington v. Morrow Cty. Bd. of Comm'rs*, No. 2:06-cv-347, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007); *see also Joiner v. Bd. of Trs. of the Flavius J. Witham Mem'l Hosp.*, No. 1:13-cv-555-WTL-DKL, 2014 WL 3543481, at *7 (S.D. Ind. July 17, 2014) (holding that plaintiffs' assertions that lunches were interrupted "two or three times a week" and "practically every day" are general assertions insufficient to overcome summary judgment). Because that is all Brand and Jackson have supplied here, they have not shown that they can demonstrate the extent of the unpaid wages owed them even under the just and reasonable inference.[9]

---

[9] Given this conclusion, the court need not address Comcast's argument that Jackson's claims should be limited to specific time periods in which he was home

Additionally, both Brand and Jackson devote three sentences of their response brief to pointing out that Comcast maintains GPS and other data that could corroborate when they were "completing tasks that Comcast itself defines as work, off-the-clock, with Comcast's knowledge." (See, e.g., R. 165, Brand Resp. Mem. at 18.) They acknowledge that "the process for gleaning this information may not be simple," but suggest that it is a "tangible way to prove" the amount of unpaid wages due. (Id.) Apparently the process is so far from simple that the plaintiffs made no attempt to engage with it to defend against Comcast's summary judgment motion. They have not explained how the process could work, let alone provided evidence from the cited data to corroborate their speculative testimony. (Id.) As the Seventh Circuit has bluntly put it, "summary judgment is the put up or shut up moment in a lawsuit." *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). If Brand and Jackson believe that the data they cite could corroborate their testimony, this was the time to demonstrate that by bringing forth actual evidence. Instead, they have done nothing more than allude to a potential process that might potentially lead to helpful evidence. Because they opted not to engage in that process, their allusion to cross-referencing data is an insufficient hoist with which to elevate their otherwise speculative testimony above the summary judgment threshold.

---

dispatched rather than home garaging and before he underwent time-keeping training in 2011. (See R. 149, Comcast Mem. at 14-15.)

## Conclusion

For the foregoing reasons, Comcast's motions for summary judgment are granted.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**