## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BRAND, et al., | ) | |
| | ) | No. 12 CV 1122 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| COMCAST CORPORATION & | ) | |
| COMCAST CABLE | ) | |
| COMMUNICATIONS MANAGEMENT, | ) | |
| LLC, | ) | |
| | ) | February 25, 2016 |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

On September 28, 2015, the court entered summary judgment in favor of
Defendants Comcast Corporation and Comcast Cable Communications
Management, LLC (together, "Comcast") with respect to the claims brought under
the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Illinois
Minimum Wage Law ("IMWL"), 820 ILCS § 105, *et seq.*, by cable line technicians
James Brand, Barry Farmer, Mark Graham, Kevin Jackson, Michael Jackson, Jose
Vigil, and Christopher Woodard (collectively, "the plaintiffs"). (R. 222.)  After giving
the parties time to consider settlement possibilities, this court entered a final
judgment in Comcast's favor on October 8, 2015.  (R. 225.)  On November 3, 2015,
the plaintiffs filed the current Consolidated Motion to Reconsider Ruling on
Summary Judgment.  (R. 226.)  For the following reasons, the motion is granted in
part and denied in part:

## Background

The relevant procedural history and factual landscape of this case is set forth in detail in this court's opinion granting Comcast summary judgment, (R. 222), and those details are incorporated by reference here. For purposes of the current motion, the court notes that it granted Comcast summary judgment with respect to three distinct categories of the plaintiffs' FLSA and IMWL claims. First, it concluded that the plaintiffs had not shown that they are entitled to compensation for time they spend waiting to be called in during their on-call shifts. (Id. at 22-29.) Second, it granted summary judgment to Comcast with respect to the plaintiffs' claims that they are entitled to compensation for unrecorded time they say they spent working during their lunch breaks. (Id. at 42-56.) Third, the court granted Comcast summary judgment with respect to the plaintiffs' claims that they are entitled to compensation for time spent in connection with tasks related to their choice to commute in a Comcast vehicle, after concluding that such time is not compensable under the Employee Commuting Flexibility Act of 1996 ("ECFA"), 29 U.S.C. § 254(a), (R. 222, Mem. Op. at 30-37), and after rejecting the plaintiffs' arguments that such time is nonetheless compensable based on what they asserted was Comcast's custom or practice of paying for time spent on such tasks, *see* 29 U.S.C. § 254(b)(2); (R. 222, Mem. Op. at 37-41). In their current consolidated motion, the plaintiffs seek reconsideration pursuant to Federal Rule of Civil Procedure 59(e) only with respect to this court's decision regarding the third category of claims.

## Analysis

A party may move to alter or amend a judgment to correct a "manifest error of law or fact" within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e); *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). Motions to amend the judgment under Rule 59 allow a party to "avoid unnecessary appellate procedures" by bringing such errors to the district court's attention. *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996). The Seventh Circuit has made clear that Rule 59(e) is not to be used as a vehicle to "advance arguments that could and should have been presented to the district court prior to the judgment." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (quotation and citation omitted). Instead, the court has interpreted the rule to reserve reconsideration for situations in which the court "has patently misunderstood a party" or has made a legal error based on inadvertence or misapprehension. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191-92 (7th Cir. 1990) (quotation and citation omitted). Because there is a presumption that judgments are final, reconsideration is granted under Rule 59(e) only in the rare circumstance where the moving party has shown that there is good reason to set the judgment aside. *Id.*; *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009).

## A.     ECFA Arguments

The plaintiffs seek to set aside the court's grant of summary judgment with respect to their claims regarding pre- and post-shift activities, arguing that this portion of the court's opinion was based on a misapprehension of law and fact, both

with respect to its conclusion that those activities are incidental to their commute within the meaning of the ECFA, and to its determination that the activities had not otherwise been made compensable via a Comcast custom or policy. None of the plaintiffs' arguments with respect to the ECFA portion of the court's decision meet the criteria for reconsideration. It must be noted that in their individual summary judgment responses, none of the plaintiffs evaluated the ECFA case law that Comcast identified. They instead relied solely on a Supreme Court case, *Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513 (2014), that deals with whether an activity is indispensable to a principal activity in a context unrelated to the ECFA. Each plaintiff made a blanket assertion that he is unable to perform his job duties as a line technician without engaging in his pre- and post-shift activities, then contended, without developing the argument, that under the *Integrity Staffing* test for indispensable activities, their pre- and post-shift duties are compensable. (See, e.g., R. 165, Brand Mem. at 12-13.) In part because of the plaintiffs' failure to engage with the case law cited by Comcast regarding incidental activities under the ECFA, and because a district court is not required to "piece together appropriate arguments" that the party responding to summary judgment failed to raise, *see Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) (quotation and citation omitted), the court concluded that the pre- and post-shift activities cited by the plaintiffs were not compensable because they are incidental to their use of a Comcast vehicle for commuting. (R. 222, Mem. Op. at 35, 37 (noting that "[i]n their response, the plaintiffs fail to explain why the tasks they identify here are

qualitatively different than the kinds of pre- and post-shift tasks that many courts have found to be incidental to the use of a company vehicle.").)

In their consolidated motion to reconsider, the plaintiffs have developed their brief original argument considerably, complete with citations to facts and cases that appear nowhere in their original responses. (R. 228, Pls.' Mem. at 17-30.) The plaintiffs advance an argument that the amount of time the plaintiffs spent engaged in the relevant tasks elevates them above incidental tasks within the meaning of the ECFA. (Id. at 18-20.) This is an argument that the court explicitly identified as missing from their summary judgment responses. (R. 222, Mem. Op. at 33 n.5.) In the current motion the plaintiffs also argue for the first time that their pre- and post-shift tasks fall outside of the ECFA because they are performed whether or not a line technician commutes in a Comcast vehicle. (R. 228, Pls.' Mem. at 22-24.) But none of them made that argument in response to Comcast's summary judgment motion. (See, e.g., R. 165, Brand Mem. at 10-13.) The plaintiffs openly admit that they are expanding on arguments that they did not fully develop the first time because they originally chose to emphasize their custom or practice argument, which they assumed was the stronger argument. (R. 228, Pls.' Mem. at 26 n.5.) Essentially, the plaintiffs concede that their decision not to develop a more robust response to Comcast's ECFA argument was a strategy decision. Although they argue that it is nonetheless within this court's discretion to consider their newly developed argument, (see id.), the Seventh Circuit has made clear that Rule 59(e) does not provide a mechanism through which parties can change strategies or

correct their own oversights. *Cincinnati Life Ins.*, 722 F.3d at 954. Accordingly, the plaintiffs' motion to reconsider is denied to the extent that they ask the court to reconsider—or more accurately, consider for the first time—their new arguments regarding the applicability of the ECFA or its interplay with the *Integrity Staffing* "integral and indispensable" test for principal activities.

## B.     The Custom or Practice Argument

The plaintiffs' collective arguments with respect to the ruling on their custom or policy argument gives the court more pause. In their responses to Comcast's motions for summary judgment, the plaintiffs all presented a brief argument contending that Comcast has a custom or practice of paying for the pre- and post-shift activities related to their use of a company vehicle for commuting purposes. In support of the argument, they cited only written Comcast policies describing compensable work and testimony from one Comcast payroll manager who said that a line technician's work day begins "the minute they start anything related to Comcast business." (See, e.g., R. 165, Brand S.J. Resp. at 11.) Citing this court's opinion in a similar case, *Blakes v. Ill. Bell Tel. Co.*, 77 F. Supp. 3d 776, 781 (N.D. Ill. 2015), the plaintiffs argued that this evidence is sufficient to establish "a demonstrable custom and practice of paying for pre and post shift work." (See R. 165, Brand S.J. Resp. at 12.) In ruling on the summary judgment motions, the court found the cited evidence in support of the plaintiffs' custom or practice argument to be lacking. Noting that in *Blakes* the plaintiffs had shown a "long-standing acquiescence" on the part of their employer for paying for the contested

6

activity, the court concluded that here the documents and snippet of manager testimony cited by the plaintiffs were insufficient to allow a reasonable jury to conclude that Comcast has a custom or practice of paying for the pre- and post-shift activities at issue.  (R. 222, Mem. Op. at 37-40.)  The court also expressed larger policy concerns regarding how interpreting employee handbook documents to establish a "custom or practice" within the meaning of 29 U.S.C. § 254(b) might impact the landscape of FLSA claims brought by employees seeking compensation for time they did not record.  (Id. at 41.)

In their current motion for reconsideration, the plaintiffs have highlighted a series of facts—present in the summary judgment record but missing from the custom or practice argument sections of their original response briefs—to explain and support their position that they should survive summary judgment with respect to the custom or practice aspect of their FLSA claims.  (R. 228, Pls.' Mot. to Reconsider at 4-8.)  Where a party is not simply rehashing old arguments, but rather shows that the court misapprehended a fact or set of facts, that showing may present a valid basis for reconsideration.  *Novick v. Staggers*, 913 F. Supp. 2d 606, 608 (N.D. Ill. 2012).  The plaintiffs' motion suggests that in its initial ruling this court misapprehended the factual foundation on which the plaintiffs' custom or practice argument rests, and the extent to which that foundation overlaps with the circumstances in the *Blakes* case.  That misapprehension warrants careful reconsideration of whether summary judgment is appropriate with respect to the plaintiffs' pre- and post-shift claims.  *See Bank of Waunakee*, 906 F.2d at 1191.

In *Blakes*, the plaintiff cable splicers claimed that the defendant employer systematically failed to pay them for overtime, including time they spent before or after their shifts completing their timesheets. 77 F. Supp. 3d at 779. The plaintiffs submitted evidence that the defendant's company policy was to compensate cable splicers for the time they spent inputting their timesheets and showing that cable splicers who reported such time were paid. *Id.* The *Blakes* plaintiffs also presented evidence that despite the written policy, they were instructed not to record any overtime for timesheet completion. *Id.* This court concluded that the evidence supported a "long-standing acquiescence to paying cable splicers for recording their time," and that such acquiescence was sufficient to allow the plaintiffs to go forward on their claim that the defendant violated its own custom or practice of compensating for timesheet completion when there was some evidence that the defendant's managers thwarted the plaintiffs' efforts to record that time. *Id.* at 781-82.

In its summary judgment ruling in this case, the court considered the evidence the plaintiffs highlighted in their response briefs and concluded that unlike the plaintiffs in *Blakes*, the plaintiffs here had not shown that Comcast had a long-standing acquiescence in compensating them for the relevant commute-related pre- and post-shift activities. (R. 222, Mem. Op. at 39.) In contrast with *Blakes*, where the plaintiffs presented evidence that they were paid for the complained-of activities when they recorded their time, 77 F. Supp. 3d at 781, here the court believed, based on the plaintiffs' response briefs, that the plaintiffs were essentially

relying only on general company documents and written policies regarding what kind of work is included in a shift to support their custom or practice argument. But in the current motion, the plaintiffs shed a clearer light on the facts in the record demonstrating the alignment of this case with *Blakes*. For example, they highlight evidence that at least two of the plaintiffs—Farmer and Kevin Jackson— have been paid for their pre- and post-shift activities when they recorded their time. (R. 228, Pls.' Mot. to Reconsider at 4.) They highlight the testimony of several managers and supervisors who say that the technicians should be paid for the kinds of activities at issue here. (Id. at 4-5.) They also point to manager testimony that line technicians have in fact been paid for performing these activities when they recorded the relevant time. (Id. at 5.) These facts support the same reasonable inference the court concluded was available to a jury in *Blakes*: that the defendant had a custom or practice of compensating employees for any time they spend on the given tasks and that individual managers thwarted that practice by encouraging or instructing the plaintiffs to work off-the-clock.

Because the plaintiffs have helped illuminate facts from which a jury might conclude that a custom or practice of paying for the commute-related pre- and post-shift activities exists, the court agrees with the plaintiffs that this is a question that should be left to the jury to resolve. *See Novesky v. Computer Cable Connection, Inc.*, No. 08-C-0130, 2011 WL 4496688, at *4-*5 (E.D. Wis. Sept. 27, 2011). And because, in contrast to their ECFA arguments, the plaintiffs are not simply changing strategy on this point or rehashing old arguments, but rather drawing

attention to the court's misapprehension of the facts presented, the court concludes that reconsideration is appropriate. Having reconsidered the factual landscape supporting the plaintiffs' custom or practice argument, the court concludes that (barring other defenses) the plaintiffs have demonstrated a material fact dispute rendering summary judgment inappropriate with regard to the custom or practice aspect of their pre- and post-shift claims. *See Novesky*, 2011 WL 4496688, at *4.

## C. Knowledge

As Comcast points out, the conclusion that the plaintiffs have pointed to sufficient facts to justify placing the custom or practice question before a jury does not end the analysis, because Comcast has asserted a knowledge defense with respect to most of the plaintiffs' pre- and post-shift claims that now must be resolved. (R. 233, Defs.' Resp. at 9-10.) Specifically, in moving for summary judgment Comcast asserted a knowledge defense to the pre- and post-shift claims of the following five plaintiffs: Brand, Farmer, Graham, Michael Jackson, and Vigil. However, with respect to Kevin Jackson and Woodard, Comcast stated that it "does not contend there is no issue of facts as to the issue of management knowledge" with respect to their claims. (R. 149, Defs.' Br. at 2, n.3; R. 155, Defs.' Br. at 2 n.3.)

To survive summary judgment with respect to their pre- and post-shift claims, the plaintiffs must offer sufficient evidence to allow a reasonable jury to conclude that Comcast either knew or should have known that they were performing this work and not being paid for it. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011). In moving for summary judgment, Comcast

argued that there is no evidence that the five noted plaintiffs either complained to their managers of working pre- or post-shift without pay or that their managers instructed them not to record the time they spent on such activities, which took place at their homes and not in a situation where their managers could have observed them. (See, e.g., R. 143, Defs.' Mem. at 12-13.) Accordingly, the court must consider whether each individual plaintiff put forth sufficient evidence of Comcast's actual or constructive knowledge in their summary judgment responses.

In contrast to their lunch-break claims, in support of which only two plaintiffs pointed to evidence that they had complained of working through lunch without pay or were instructed not to record their lunch-break work time, with respect to their pre- and post-shift claims all five plaintiffs have pointed to such evidence. The particulars of that evidence are described below.

### 1.     Brand

Brand testified that his manager, Dave Johnson, instructed him not to start his time when he first turned on his computer in the morning. (R. 166, Brand Add'l Facts ¶ 35.) He testified that Johnson instructed him only to record his scheduled hours on his time sheet. (Id.) Similarly, Brand testified that manager (and later supervisor) Mark Espinosa instructed him not to record work performed before the start of his shift and not to record a start time other than the regularly scheduled start time. (Id. ¶¶ 35-36; R. 186, Ex. 2, Brand Dep. at 38-39.) He also testified that his managers instructed him not to record time spent working outside his shift, and that he did not record time he spent working after his shift ended because he was

instructed to record only his scheduled stop time.  (R. 166, Brand Add'l Facts ¶ 48; R. 186, Ex. 2, Brand Dep. at 152.)

### 2. Farmer

Similarly, Farmer testified that Espinosa advised him against recording his time from the moment he logged onto his computer if that happened before the regular start time of 7:30 a.m.  (R. 169, Farmer Add'l Facts ¶ 38.)  He also testified that he told three supervisors and one manager that he was logging on before his scheduled start time.  (Id. ¶ 36.)  He testified further that he complained in meetings with supervisors that he spends time conducting vehicle inspections, entering his time, and securing his equipment after his shift ends but does not get paid for it.  (Id. ¶ 49.)

### 3. Graham

Graham testified that Espinosa told line technicians not to record on his timesheet the pre-shift time he spends logging into his computer.  (R. 172, Graham Add'l Facts ¶ 34.)  He testified that Johnson specifically instructed him to log into his computer at 7:00 a.m., but not to record his start time until 7:30 a.m.  (Id. ¶ 35.)  Graham further testified that there were times when he tried to record time spent on his post-shift activities, but that time was rejected.  (Id. ¶ 46.)  He also testified that he was instructed to report his time as ending at 4:30 p.m., even though he had to do things like secure his truck and equipment every day after he arrived at home.  (R. 186, Ex. 9, Graham Dep. at 36, 53.)

### 4. Michael Jackson

Michael Jackson testified that Espinosa told him during a meeting not to record any time he spent working prior to the scheduled 7:30 a.m. start time. (R. 178, M. Jackson Add'l Facts ¶ 36.) After that meeting Michael Jackson complained to his supervisor at least twice that he was performing work before the start of his shift and not getting paid for it. (Id. ¶ 37.) He further testified that he was instructed not to record the time he spends post-shift downloading his meter and that he is required to spend time after 4:30 p.m. securing his truck and equipment. (Id. ¶¶ 46-47.)

### 5. Vigil

Like the other plaintiffs, Vigil testified that Espinosa advised him not to enter his start time as the time when he logs into his computer, instead instructing him to record his start time as 7:30 a.m. (R. 181, Vigil Add'l Facts ¶ 37.) However, Vigil did not point to any evidence that his supervisors had actual or constructive knowledge that he was working after his shift. (R. 181, Vigil Add'l Facts ¶¶ 49-50.) The deposition testimony he cites in the "Complaints and Notice About Underpayment and Instructions Not to Record Post Shift Time" section of his additional facts only states that when Vigil worked past 4:30 p.m. he recorded his time and was paid. (R. 186, Ex. 17, Vigil Dep. at 92-96.) That testimony is insufficient to allow a jury to conclude that his supervisors knew that he was working post-shift without pay.

Given the testimony from these five plaintiffs that they either were instructed not to record time they worked pre-shift or that they complained about performing such work without pay and received no recourse, a reasonable jury could conclude that Comcast had actual or constructive knowledge that the plaintiffs were performing pre-shift work without pay. *See Kellar*, 664 F.3d at 177. The same is true with respect to the evidence regarding Comcast's knowledge that Brand, Farmer, Graham, and Michael Jackson were working post-shift without pay. Accordingly, Comcast is not entitled to summary judgment with respect to those claims based on its knowledge defense.

## D. Damages

Finally, Comcast argued in moving for summary judgment that even if the complained-of pre- and post-shift duties are compensable, and even if there is evidence from which a jury could infer Comcast's knowledge that the plaintiffs were working off-the-clock, summary judgment is nonetheless appropriate with respect to these claims based on what it characterizes as the plaintiffs' speculative damages estimations. (See, e.g., R. 143, Defs.' S.J. Mem. at 14-15.) In its original summary judgment ruling, this court found that argument persuasive with respect to the two lunch-break claims that survived through the damages point of the analysis, because the only testimony the two relevant plaintiffs cited involved guesswork about the frequency of days on which they did or did not work through lunch. (R. 222, Mem. Op. at 55.) Because they pointed to no memory-triggering factors or details that would elevate their testimony above the level of speculation, the court

concluded that they could not demonstrate the extent of the unpaid wages owed them even under the "just and reasonable inference" standard that applies where there is evidence that supervisors discouraged the plaintiffs from accurately reporting their time. (Id.); *see also Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007). By contrast, at least with respect to the pre-shift claims, the plaintiffs uniformly testified that they complete work outside of their shift not occasionally, but on every working day, and they identified fairly narrow, consistent windows of unpaid time. Most of the plaintiffs also pointed to evidence that they work after their shift ends without pay on a consistent, routine basis and within a discernible window. The relevant evidence is described below.

### 1.      Brand

Brand testified that until he attended a time-keeping training course in the fall of 2011, he did not record the time he spent logging onto his laptop before his shift. (R. 166, Brand Add'l Facts ¶ 33.) He testified that he typically logged into his computer to start his day at 6 a.m. and that this was a "set time." (Id. ¶ 32; R. 186, Ex. 2, Brand Dep. at 212.) As for post-shift work, Brand testified that he spent 15 to 20 minutes shutting down computer programs after his shift ended and 20 minutes securing equipment. (R. 166, Brand Add'l Facts ¶ 46; R. 186, Ex. 2, Brand Dep. at 137-48.) Brand testified that he always had to perform his vehicle inspection at home, which supports an inference that he always performed that task after his shift ended. (R. 186, Ex. 2, Brand Dep. at 129.)

### 2. Farmer

Farmer also testified that prior to a late 2011 time-keeping training he would not record the time he spent logging into his computer. (R. 169, Farmer Add'l Facts ¶ 34.) Farmer testified that he would arrive at work every day 15 to 20 minutes before the start of his shift to perform tasks like gathering equipment and downloading his meter. (Id. ¶ 32, R. 186, Ex. 7, Farmer Dep. at 200-01.) He testified that he often spends 25-40 minutes per day after the end of his shift performing tasks like closing his computer programs, securing equipment, and entering his time, but said that sometimes he is able to perform those tasks before the end of his shift. (R. 169, Farmer Add'l Facts ¶ 47; R. 186, Ex. 7, Farmer Dep. at 98-102.) Farmer testified that there are days when he can do all of his end-of-day tasks before 4:30 p.m. and there are days when he does them after 4:30 p.m., but he tries to finish as close to 4:30 p.m. as possible. (R. 186, Farmer Dep. at 100-01.) Whether he finishes before or after 4:30 p.m. depends on factors like the order in which he completes the task and whether he is in an area where he feels comfortable securing his equipment on location. (Id. at 101-02.) Farmer testified that he records his time spent on post-shift tasks if he spends over a half-hour on them, and is paid for that time. (Id. at 103-04.) But if he spends less than a half-hour, Farmer does not record the time. (Id.) He testified that he "couldn't tell you" how much unrecorded time he spent working after 4:30 p.m. (R. 138-7, Farmer Dep. at 133.)

### 3. Graham

Graham testified that every day during his time as a home dispatch technician he had to start working between 6:30 and 7:00 a.m. in order to login, identify his jobs and their locations, and inspect his truck before the start of his shift. (R. 172, Graham Add'l Facts ¶ 33.) After his shift Graham took 10 to 15 minutes per day securing his vehicle after he arrived at home. (Id. ¶¶ 42-44.)

### 4. Kevin Jackson

During his time as a home dispatched lead technician, Kevin Jackson was required to prepare and send routes to other line technicians before 7 a.m. (R. 175, K. Jackson Add'l Facts ¶ 31.) He would regularly log into his laptop before 7:30 a.m. so he could assign jobs to the other technicians within the required timeframe. (Id. ¶ 36.) Those tasks could take 20 to 40 minutes. (R. 186, Ex. 10, K. Jackson Dep. at 265-66.) After his shift, Kevin Jackson had to spend anywhere from a few minutes to 30 minutes or more completing his safety check, securing his van, and storing equipment. (R. 175, K. Jackson Add'l Facts ¶ 49.) Sometimes he is able to perform all of those tasks before 4:30 p.m., but it "doesn't happen that often." (R. 186, Ex. 10, K. Jackson Dep. at 182, 187.) During his time as a lead technician he had additional post-shift duties and they required 30 to 60 minutes of uncompensated time. (R. 175, K. Jackson Add'l Facts ¶ 50; R. 186, Ex. 10, K. Jackson Dep. at 284.) But when he was not working as a lead technician and was home garaged, he "very infrequently" sent emails or conducted work on his computer after 4:30 p.m. (R. 176, K. Jackson Resp. to Defs.' Facts ¶ 66.)

Additionally, after he received a timekeeping training on September 19, 2011, Kevin Jackson reported and was paid for all the time he worked past the end of his shift. (Id. ¶¶ 22-23.)

Here it should be noted that in moving for summary judgment with respect to Kevin Jackson, Comcast argued that his pre-shift claims should be limited to the period when he was home dispatched because he testified that when he was home garaged he "very infrequently" logged in before the start of his shift. (R. 149, Defs.' Mem. at 14-15.) It is undisputed that Kevin Jackson has not been home dispatched since approximately January 2013. (R. 176, K. Jackson Resp. to Defs.' Facts ¶ 11.) Comcast further argued that Kevin Jackson's post-shift claims should be limited to the period before he received timekeeping training on September 19, 2011, because his undisputed testimony is that after that training he reported and was paid for all of the time he worked after the end of his shift. (R. 149, Defs.' Mem. at 15; see also R. 222, Mem. Op. at 55 n.9; R. 176, K. Jackson Resp. to Defs.' Facts ¶¶ 22-23.) Kevin Jackson has addressed this argument only in a footnote to the plaintiffs' summary judgment sur-reply, where he asserted that this "issue need not be addressed at this juncture." (R. 216, Pls.' Sur-Reply at 23 n.12.) In support, he cites the *Blakes* decision, where in denying summary judgment with respect to the certified class's claims the court stated that objections regarding individual plaintiffs whose timesheets fell outside the relevant period could be dealt with during the damages phase of the trial. *Blakes*, 77 F. Supp. 3d at 787. But, here Kevin Jackson responded to Comcast's motion for summary judgment as an

individual, and there is no reason why he should not be held to a substantive response at the summary judgment stage. Because a failure to address an issue in response to summary judgment results in waiver, *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014), the court agrees that Kevin Jackson's pre-shift claims should be limited to the relevant period before January 2013 and his post-shift claims should be limited to the relevant period before September 19, 2011.

### 5. Michael Jackson

Michael Jackson testified that every morning he worked as a home dispatched line technician he spent between 20 and 30 minutes performing tasks like logging into his computer, accessing jobs, and determining what equipment he would need. (R. 178, M. Jackson Add'l Facts ¶ 32.) He also spent between 20 and 25 minutes every morning inspecting his vehicle. (Id. ¶ 33.) He testified that after his shift ended he had to spend an additional 20 to 25 minutes sending an end-of-day email to his supervisors, inspecting his vehicle again, locking down his truck, and securing his equipment. (Id. ¶¶ 42, 44-45.) He spent an additional 15 minutes working after his shift on Thursdays, when he had to download his meter. (Id. ¶ 43.)

### 6. Vigil

Vigil testified that when he was home dispatched he had to log into his computer before the start of his shift to learn the location of his day's job. (R. 181, Vigil Add'l Facts ¶ 30.) When he was home garaging, he spent about 10 minutes

before the start of his shift downloading his meter, about 30 minutes to inspect his vehicle, and 10 to 15 minutes to check his job assignments. (Id. ¶¶ 32-33.)

### 7. Woodard

Woodard testified that he spent 30 minutes every work day on pre-shift duties like inventory checks. (R. 184, Woodard Add'l Facts ¶ 30.) He spent 15 to 20 minutes after the close of his shift each day performing tasks like dropping off bad equipment. (Id. ¶ 42.)

As described above, the plaintiffs all testified that they consistently performed a set of tasks before the start of their shifts during their time as line technicians. In contrast to their lunch-hour claims, where the relevant plaintiffs could only speculate as to whether they had worked through lunch on given days, at least with respect to pre-shift activities the evidence supports an inference that the plaintiffs always performed such duties, and that the time they spent on such tasks was fairly consistent within certain windows of time. Because these tasks were a matter of routine, the "particulars of the jobs the technicians did" coupled with their reconstructed memories could enable a jury to come to a "just and reasonable inference" about the amount of unpaid time the plaintiffs spent working before the start of their shifts. *See Espencheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013). Comcast disputes the amount of time the plaintiffs say they spent on pre-shift tasks, but the credibility of their accounts is an issue for a jury to resolve. And because a jury could make a just and reasonable inference regarding damages

based on the plaintiffs' testimony regarding the amount of unpaid pre-shift work they performed, the plaintiffs have shown that a jury should decide the question.

The evidence regarding the amount of unpaid work the plaintiffs performed post-shift is more of a mixed bag. Farmer testified that he is sometimes able to complete all of his end-of-the day tasks before his shift ends at 4:30 p.m., depending on various factors. Similarly, Kevin Jackson testified that when he was working as a line technician rather than a lead technician, he was sometimes able to complete his end-of-the-day activities within the confines of his shift. In their response briefs the only "triggering factor" or other method by which a reasonable jury could discern via a just and reasonable inference which days these two plaintiffs worked past their shift's end without recording it is an unidentified "process for gleaning" information from Comcast data that this court found insufficient in its original opinion.[1] (R. 222, Mem. Op. at 56; R. 168, Farmer S.J. Resp. at 19; R. 174, K. Jackson S.J. Resp. at 19.) The plaintiffs have not addressed that aspect of the court's decision in the current motion to reconsider. Accordingly, the damages aspect of Farmer's post-shift claims suffer from the same short-comings this court found precluded summary judgment with respect to Brand and Kevin Jackson's lunch-break claims. (Id. at 54-56.) The same is true for Kevin Jackson's post-shift

---

[1] The court notes that Farmer testified that he could look at his daily logs to see when his jobs were closed out and consult "my little notes that I might have jotted down if I had an issue on that particular day" to piece together "a better guesstimate" about which days he worked past his shift without recording the time. (R. 138-7, Farmer Dep. at 133.) But Farmer did not cite that testimony in his response brief or statements of facts and has not argued that it provides evidence that other memory triggering factors are available to him.

claims pertaining to any time he was not working as a lead technician, because he testified that his lead technician duties caused him to work 30 to 60 minutes past the end of his shift. Given the court's conclusion that his post-shift claims are limited to the discrete period before September 19, 2011, they should be further limited to any period before that date when he was working in a lead technician role.

On the other hand, the testimony from Brand, Graham, Michael Jackson, and Woodard supports an inference that they performed tasks after their shifts ended as a matter of course. As with their pre-shift claims, they have given a time window for those tasks based on the routine nature with which they had to complete them. That is sufficient at this stage in the litigation to allow the matter to proceed to a jury to evaluate the foundation of their damages claim. *See Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 597-98 (7th Cir. 2008). Accordingly, upon reconsideration, the court concludes that: (1) summary judgment is inappropriate with respect to all of the plaintiffs' claims that Comcast violated its own custom or practice regarding paying line technicians for performing the complained-of pre-shift activities, although Kevin Jackson's pre-shift claims are limited to the period before January 2013; and (2) summary judgment is inappropriate with respect to the post-shift claims of Brand, Graham, Michael Jackson, Woodard, and Kevin Jackson to the extent he is seeking damages for post-shift tasks connected to his lead technician role prior to September 19, 2011.

## Conclusion

For the foregoing reasons, the plaintiffs' collective motion for reconsideration is granted in part and denied in part. Consistent with the explanation in this opinion, the summary judgment ruling entered by this court on September 28, 2015, (R. 225), is amended to the extent that summary judgment is denied only with respect to the plaintiffs' FLSA and IMWL claims relating to unpaid pre-shift activities with the exception of Kevin Jackson's pre-shift activities in the period after January 2013. The ruling is also amended to the extent that summary judgment is denied with respect to the claims of Brand, Graham, Michael Jackson, and Woodard regarding post-shift activities; and with respect to the post-shift claims of Kevin Jackson within any relevant period before September 19, 2011, when he was employed as a lead technician. Furthermore, the final judgment entered on October 8, 2015, (R. 225), is vacated to allow for further proceedings in this case.

ENTER:

Young B. Kim
United States Magistrate Judge